# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

_____

GERALD L. EUBANKS and )
DETERMINATION III 130 )
WESTPORT, LLC, )
                     )
      Plaintiffs, )
                     )
   v. )
                     )
HOWARD LUTNICK, in his )
official capacity as Secretary of the )
U.S. Department of Commerce, and )
NATIONAL OCEANIC AND )
ATMOSPHERIC ADMINISTRATION, )
                     )
      Defendants, )
                     )
    and )
                     )
WHALE AND DOLPHIN )
CONSERVATION, DEFENDERS OF )
WILDLIFE, CONSERVATION LAW )
FOUNDATION, and CENTER FOR )
BIOLOGICAL DIVERSITY, )
                     )
      Defendant-Intervenors )
      (proposed). )
_____ )

No. 8:25-cv-614-CEH-AAS

**CONSERVATION GROUPS'
MOTION TO INTERVENE
AS DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION .................................................................................1

BACKGROUND ...................................................................................3

I.    The North Atlantic Right Whale ........................................................3

II.   The Endangered Species Act .............................................................7

III.  The Marine Mammal Protection Act ..................................................9

IV.   The 2008 Vessel Speed Rule ............................................................11

ARGUMENT ....................................................................................14

I.    Conservation Groups Are Entitled to Intervene as of Right ............14

      A.    Conservation Groups' Motion is Timely .................................15

      B.    Conservation Groups Have a Substantial Interest in the
            2008 Vessel Speed Rule Protection Right Whales .................16

      C.    The Disposition of This Case May Impair Conservation
            Groups' Ability to Protect Their Interests..............................19

      D.    Conservation Groups' Interests Are Not Adequately
            Represented by Any Existing Party.......................................21

II.   Alternatively, the Court Should Grant Permissive Intervention ....23

CONCLUSION...................................................................................24

LOCAL RULE 3.01(g) CERTIFICATION ..................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almengor v. City of Jacksonville*,
No. 11-116, 2011 WL 845835 (M.D. Fla. Mar. 8, 2011) ............................. 15

*Chiles v. Thornburgh*,
865 F.2d 1197 (11th Cir. 1989)................................................. 14, 15, 18, 20

*Clark v. Putnam Cnty.*,
168 F.3d 458 (11th Cir. 1999)...................................................................... 20

*Cnty. of Fresno v. Andrus*,
622 F.2d 436 (9th Cir. 1980)........................................................................ 21

*Coal. of Ariz./N.M. Ctys. v. Dep't of Interior*,
100 F.3d 837 (10th Cir. 1996)...................................................................... 21

*Coastal Conserv. Ass'n v. Locke*,
No. 9-641, 2010 WL 1407681 (M.D. Fla. Jan. 19, 2010) ............................ 21

*Colosi v. Charlotte Cty.*,
No. 24-1004 (M.D. Fla. Feb. 26, 2025) ................................................. 16, 19

*Dillard v. Chilton Cnty. Comm'n*,
495 F.3d 1324 (11th Cir. 2007).................................................................... 13

*Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*,
983 F.2d 211 (11th Cir. 1993)...................................................................... 14

*Fla. Wildlife Fed'n, Inc. v. Johnson*,
No. 8-324, 2009 WL 248078 (N.D. Fla. Feb. 2, 2009) ................................ 24

*FUFC, LLC v. Cers Envtl. Serv., Inc.*,
No. 19-231, 2019 WL 12323498 (M.D. Fla. June 13, 2019) ....................... 14

*Fund for Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003).................................................................... 20

*Georgia v. U.S. Army Corps of Eng'rs*,
302 F.3d 1242 (11th Cir. 2002).................................................................... 15

*Kokechik Fishermen's Ass'n v. Sec'y of Comm.*,
   839 F.2d 795 (D.C. Cir. 1988) ........................................................................ 8

*Loyd v. Ala. Dep't of Corr.*,
   176 F.3d 1336 (11th Cir. 1999) ..................................................................... 14

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................ 17

*Miccosukee Tribe of Indians of Fla. v. United States*,
   No. 05-23045, 2006 WL 8432717 (S.D. Fla. May 15, 2006) ........................ 17

*Nat'l Parks Conserv. Ass'n v. U.S. Dep't of Interior*,
   No. 11-578, 2012 WL 1060144 (M.D. Fla. Mar. 29, 2012) .......................... 16

*S. Dade Land Corp. v. Sullivan*,
   155 F.R.D. 694 (S.D. Fla. 1994) .................................................................... 16

*Salvors, Inc. v. Unidentified Wrecked & Abandoned Vessel*,
   861 F.3d 1278 (11th Cir. 2017) ..................................................................... 18

*Stallworth v. Monsanto Co.*,
   558 F.2d 257 (5th Cir. 1977) ......................................................................... 14

*Stone v. First Union Corp.*,
   371 F.3d 1305 (11th Cir. 2004) ..................................................................... 18

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) .......................................................................................... 6

*Trbovich v. United Mine Workers of Am.*,
   404 U.S. 528 (1972) ........................................................................................ 20

*United States v. Jefferson City*,
   720 F.2d 1511 (11th Cir. 1983) ..................................................................... 23

*USAA Life Ins. Co. v. Doss*,
   No. 15-93, 2016 WL 877843 (M.D. Fla. Jan. 29, 2016) .............................. 15

*Western Energy All. v. Zinke*,
   877 F.3d 1157 (10th Cir. 2017) ..................................................................... 22

*Whale and Dolphin Conserv. v. Nat'l Marine Fisheries Serv.*,
   No. 21-112 (D.D.C.) ....................................................................................... 22

iii

**Statutes**

16 U.S.C. § 1361(1) ........................................................................8

16 U.S.C. § 1382(a) ........................................................................9

16 U.S.C. § 1531(a)(2) ...................................................................6

16 U.S.C. § 1532(3) ........................................................................7

16 U.S.C. § 1540(f) .........................................................................7

**Other Authorities**

50 C.F.R. § 224.105(a) .................................................................. 11

50 C.F.R. § 224.105(b) .................................................................. 11

50 C.F.R. § 224.105(c) .................................................................. 11

50 C.F.R. § 229.2 ............................................................................3

69 Fed. Reg. 30,857, 30,858 (June 1, 2004) ................................. 10

71 Fed. Reg. 36,299, 36,300 (June 26, 2006) ............................... 10

73 Fed. Reg. 60,173 (Oct. 10, 2008) ......................................*passim*

78 Fed. Reg. 34,024, 34,026 (June 6, 2013) ................................. 12

78 Fed. Reg. 73,726 (Dec. 9, 2013) ........................................ 12, 13

Federal Rule of Civil Procedure 24(a) ....................................*passim*

Federal Rule of Civil Procedure 24(b) ................................. 1, 23, 24

Federal Rule of Civil Procedure 24(c) ...........................................2

H.R. Rep. No. 92-107 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4144 .................9

**INTRODUCTION**

Whale and Dolphin Conservation, Defenders of Wildlife, Conservation Law Foundation, and Center for Biological Diversity (collectively, "Conservation Groups") move to intervene as defendants under Federal Rules of Civil Procedure 24(a) and 24(b). Conservation Groups seek to safeguard their substantial interests in the regulation at issue, which protects critically endangered North Atlantic right whales from deadly vessel strikes. *See* 73 Fed. Reg. 60,173 (Oct. 10, 2008) ("Vessel Speed Rule" or "Rule").

The right whale is one of the most endangered whales on Earth. Vessel strikes are one of the two primary threats to its continued existence (the other is fishing gear entanglements). No other causes of mortality for right whales who survive their first year have been documented. Defendants issued the Vessel Speed Rule after determining, based on the best scientific information, that requiring large vessels to slow down in certain areas at certain times would reduce the risk of fatal strikes, helping to ensure the survival of the species and put it on the road to recovery.

Plaintiffs contest the validity of a civil penalty they received for violating the Vessel Speed Rule, claiming that neither the Endangered Species Act (ESA) nor Marine Mammal Protection Act (MMPA) gives Defendants the requisite authority to issue the rule. A ruling in Plaintiffs' favor could severely restrict Defendants' ability to implement and enforce a

1

rule critical to the very survival of the right whale—a species that Conservation Groups have sought to protect from vessel strikes for decades.

Conservation Groups satisfy the standards for intervention under Rule 24(a). This motion is timely. They and their members have direct and legally cognizable interests in the Vessel Speed Rule that may be impaired by this litigation. Their interests will not be adequately represented by any existing party. In the alternative, Conservation Groups request permissive intervention under Rule 24(b).[1]

## BACKGROUND

## I.    The North Atlantic Right Whale

Norse and Basque whalers in Europe targeted the North Atlantic right whale as early as the ninth century, eventually extirpating the species from its eastern North Atlantic range. By the end of the nineteenth century, whalers had hunted the species to the point of commercial extinction in its western North Atlantic range. When the League of Nation's Convention for the Regulation of Whaling prohibiting killing right whales entered into force in 1935, there may have been as few as 100 surviving animals. The species is

---

[1] This Motion is supported by the Declarations of Regina Asmutis-Silvia (Ex. 1), Michael P. Senatore (Ex. 2), Sean Mahoney (Ex. 3), Vi Patek (Ex. 4), Miyoko Sakashita (Ex. 5), and Molly Harding Bartlett (Ex. 6). Pursuant to Federal Rule of Civil Procedure 24(c), Conservation Groups have concurrently filed a Proposed Answer.

now primarily found in Canadian and U.S. waters in the Atlantic. Its only known calving grounds are in southeastern U.S. waters.

Between the end of commercial whaling in the 1930s and the statutory protections afforded by the ESA and MMPA since the early 1970s, the right whale's population slowly grew to a high of about 477 individuals in 2010. However, human activities are once again killing right whales at unsustainable rates. Vessel strikes[2] and fishing gear entanglements are inhibiting the species' recovery and threatening its survival.[3]

In 2010, the right whale population began declining again due to climate change-induced population shifts and increased entanglements and vessel strikes. Right whale deaths and injuries spiked dramatically starting in 2017, when Defendants designated an active Unusual Mortality Event (UME) under the MMPA. More than twenty percent of the population has been tallied in the UME, including 41 confirmed deaths, 39 serious injuries (i.e., injuries that will likely result in mortality, *see* 50 C.F.R. § 229.2), and 71 morbidities (sublethal injuries and illnesses). *See supra* n.3.

---

[2] NOAA Fisheries, *North Atlantic Right Whale (Eubalaena glacialis) Vessel Speed Rule Assessment*, Office of Protected Resources, 1 (June 2020), https://www.fisheries.noaa.gov/s3/2021-01/FINAL_NARW_Vessel_Speed_Rule_Report_Jun_2020.pdf.
[3] NOAA Fisheries, *2017-2025 North Atlantic Right Whale Unusual Mortality Event*, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2025-north-atlantic-right-whale-unusual-mortality-event, last updated Mar. 14, 2025.

The species has long been considered one of the "the world's most critically endangered large whale species and one of the world's most endangered mammals." 73 Fed. Reg. at 60,173. The whale's "low reproduction level and small population size" mean that "even low levels of human-caused mortality can pose a significant obstacle for [its] recovery." *Id.*

With about 370 surviving animals in 2023, the right whale is once again approaching extinction.[4] Alarmingly, scientists estimate that there are only 70 reproductively active females.[5] According to Defendants, "[e]very single female North Atlantic right whale and calf are vital to this endangered species' recovery." *See supra* n.6. The combined impacts of vessel strike injuries, entanglements, and climate-driven changes in prey availability have significantly decreased calving rates. *Id.* With deaths outpacing births, "[t]he only solution is to significantly reduce human-caused mortality and injuries, as well as stressors on reproduction." *Id.*

Vessel strikes kill or injure right whales through blunt force trauma and/or propeller strikes that result in deep, broad wounds, blood loss, crushed bones, and/or amputations. 73 Fed. Reg. at 60,174. Many living whales bear

---

[4] NOAA Fisheries, *Population size estimation of North Atlantic right whales from 1990-2023*, NOAA Technical Memorandum NMFS-NE-324 (Oct. 2024), https://repository.library.noaa.gov/view/noaa/66179; *see also supra* n.3 ("right whales are approaching extinction").

[5] NOAA Fisheries, *North Atlantic Right Whale Calving Season 2025*, https://www.fisheries.noaa.gov/national/endangered-species-conservation/north-atlantic-right-whale-calving-season-2025, last updated Mar. 3, 2025.

wounds or scars of nonlethal collisions, which can make right whales vulnerable to subsequent injury or death.[6] For example, a female right whale nicknamed Lucky "survived lacerations from a 1991 collision when she was a calf, only to die in January 2005 when she became pregnant for the first time and the old wounds reopened."

Right whales are prone to vessel strikes because of how much time they spend just below the surface of the water, "rendering them hidden to mariners but vulnerable to vessel collisions." *See supra* n.2 at 3. The risk of collisions with mother-calf pairs is especially high because of how much time they spend resting and nursing near the water's surface. *Id.* As Defendants have stated, the "effect of vessel-related deaths on right whale recovery is especially significant because a disproportionate number of ship strike victims are female right whales." 73 Fed. Reg. at 60,174. Less than a year ago, a 35-year-old female was found dead off Virginia with catastrophic injuries consistent with blunt force trauma from a vessel strike prior to death. Her dependent newborn calf—her sixth—could not have survived.[7]

---

[6] NOAA Fisheries, *North Atlantic Right Whale (Eubalana glacialis), Stock Definition and Geographic Range*, 27 (Nov. 2024), https://www.fisheries.noaa.gov/s3/2024-12/2023-sar-narw.pdf.

[7] *See* NOAA Fisheries, *North Atlantic Right Whale Updates*, https://www.fisheries.noaa.gov/national/endangered-species-conservation/north-atlantic-right-whale-updates, last updated Feb. 18, 2025 (*see* Dead Female Right Whale (1950) Off Virginia, April 4, 2024).

Defendants' Recovery Plan for the North Atlantic Right Whale lists steps to "reduce and eliminate" vessel strike mortalities and injuries as one its highest priorities.[8] "[D]eveloping and implementing an effective strategy to address this threat is essential to recovery of the species." 73 Fed. Reg. at 60,174; *see also id*. (for "the North Atlantic right whale population to recover, vessel-related deaths and injuries must be reduced.").

## II.    The Endangered Species Act

In 1973, recognizing that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction," 16 U.S.C. § 1531(a)(2), Congress enacted the ESA, *id*. §§ 1531–1544, "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species," *id*. § 1531 (b). Considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978), the ESA embodies Congress' "plain intent" to "halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

The ESA defines conservation as "to use and the use of all methods and procedures which are necessary to bring any [listed species] to the point at

---

[8] NOAA Fisheries, *Recovery Plan for the North Atlantic Right Whale (Eubalaena glacialis), Revision*, II (May 26, 2005), https://repository.library.noaa.gov/view/noaa/3411.

which the measures provided pursuant to [the statute] are no longer necessary." 16 U.S.C. § 1532(3). Its explicit goal is not simply to prevent species from becoming extinct but to fully recover them.

The ESA mandates that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance" of the statute's purposes. *Id.* § 1531(c)(1). While the Secretary of Interior or Commerce "shall review other programs administered by him and utilize such programs in furtherance" of the statute's purposes, "[a]ll other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities" to further its purposes "by carrying out programs for the conservation" of listed species. *Id.* § 1536(a)(1).

The ESA also requires the Secretary to develop and implement recovery plans "for the conservation and survival" of listed species. *Id.* § 1533(f). A recovery plan must "incorporate . . . a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species." *Id.* § 1533(f)(1)(B)(i). It acts as a roadmap to full recovery. *See id.* § 1533(f).

The ESA authorizes the Secretary to promulgate regulations as appropriate to enforce the statute. 16 U.S.C. § 1540(f). It is unlawful for any person to violate any such regulation pertaining to a listed species, *id.* §

7

1538(a)(1)(G), or to attempt to commit, solicit another to commit, or cause another to commit any such offense, *id.* § 1538(g).

## III.  The Marine Mammal Protection Act

In enacting the MMPA in 1972, 16 U.S.C. §§ 1361–1389, Congress declared that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic" and "that they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem." *Id.* § 1361(6). The D.C. Circuit has stated that the MMPA's "primary goal" is to "protect[] marine mammals" and that "[t]he interest in maintaining healthy populations of marine mammals comes first" under the statute. *Kokechik Fishermen's Ass'n v. Sec'y of Comm.*, 839 F.2d 795, 800, 802 (D.C. Cir. 1988).

Congress recognized that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). It explicitly determined that "such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part" and that "they should not be permitted to diminish below their optimum sustainable population." *Id.* §

8

1361(2). "Optimum sustainable population" is "the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." *Id.* § 1362(9).

The MMPA authorizes the Secretary of Commerce to prescribe such regulations as are necessary and appropriate to carry out the statute's purposes. 16 U.S.C. § 1382(a).

Congress specifically recognized that enacting the MMPA would provide much-needed authority to regulate vessels that may injure or kill marine mammals. The House Report from the Committee on Merchant Marine and Fisheries stated that "[s]till another problem to which marine mammals may be inadvertently exposed is the operation of high-speed boats. Manatees and sea otters have been crippled and killed by motorboats and at present the Federal government is essentially powerless to force these boats to slow down or to curtail their operations." *See* 1972 H.R. Rep. No. 92-107 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4147; *see also id.* at 4150 (identifying a principal hazard to manatees as "the operation of powerboats in areas where the manatees are found" and stating that the MMPA "would provide the Secretary . . . with adequate authority to regulate or even forbid the use of [such] powerboats[.]").

IV.    **The 2008 Vessel Speed Rule**

Vessel strikes have long been recognized as an existential threat to the right whale. From 1986 to 2006, there were 19 known right whale deaths from vessel strikes. 71 Fed. Reg. 36,299, 36,300 (June 26, 2006). The actual number of deaths during this time was "almost certainly higher" given that most right whale deaths are not detected. *Id.*

In 1999, Defendants initiated a series of stakeholder meetings to discuss ways to reduce vessel strikes. 71 Fed. Reg. at 36,301. In 2001, they commissioned a report based on these stakeholder meetings on recommended vessel strike reduction measures. They used that report as a baseline to develop a strategy that included research, regulation development, and international action. *Id.*; *see also* 69 Fed. Reg. 30,857, 30,858 (June 1, 2004). Defendants initiated rulemaking under the ESA and MMPA via an advance notice of proposed rulemaking in 2004, 69 Fed. Reg. at 30,857; issued a proposed rule in 2006, 71 Fed. Reg. at 36,299; and finalized it in 2008, 73 Fed. Reg. at 60,173 (codified at 50 C.F.R. § 224.105). Defendants based the Vessel Speed Rule on a comprehensive review of scientific data demonstrating that higher vessel speeds increase both the likelihood of a vessel striking a right whale and the probability that the strike will kill or seriously injure that whale. *Id.*

The Vessel Speed Rule requires vessels 65 feet or longer to slow to ten nautical miles per hour ("knots") or less in certain areas at certain times of year. *See* 50 C.F.R. § 224.105(a)–(b). These are known as Seasonal Management Areas. *See* 73 Fed. Reg. at 60,178; *see also* 50 C.F.R. § 224.105(a)(1)–(3). The Rule contains an exemption allowing any regulated vessel to deviate from the speed limit for safety reasons when ocean or weather conditions demand it, so long as the deviation is attested to in its logbook. 50 C.F.R. § 224.105(c).[9] As Defendants have explained, when they begin an enforcement investigation, "vessel operators are given an opportunity to provide evidence that they deviated from the requirements of the rule to maintain safe maneuvering speed, specifically due to oceanographic, hydrographic and/or meteorological conditions on transits which were in alleged violation of the speed rule." *See supra* n.2 at 31.

The Rule also established a voluntary Dynamic Management Area program. 73 Fed. Reg. at 60,179–180. When an aggregation of three or more right whales is sighted in an area not covered by a Seasonal Management Area, Defendants send out a notification asking (but not requiring) mariners to avoid the area or slow to ten knots or less when traveling through it. *Id.* at

---

[9] The rule exempts outright vessels owned, operated by, or under contract to the federal government as well as law enforcement vessels of a state or political subdivision when engaging in law enforcement or search and rescue operations. 50 C.F.R. § 224.105(a).

60,180. These voluntary zones last for 15 days, unless extended based on resighting right whales in the same area. *Id.*

The Vessel Speed Rule contained a five-year sunset clause. *Id.* at 60,186. In June 2013, Defendants proposed to make it permanent because "the justification for establishing the initial rule remains applicable and is supported by subsequent studies regarding the diminished probability of lethal strikes" with the Rule in place. 78 Fed. Reg. 34,024, 34,026 (June 6, 2013). Defendants made the Rule permanent in December 2013. 78 Fed. Reg. 73,726 (Dec. 9, 2013); *see also id.* at 73,733 ("New data, including new analysis of existing data and new information provided during the public comment period, further support the validity of vessel speed restrictions to protect right whales . . . . No known right whale deaths have occurred in speed restriction [areas] in the time since the restrictions were implemented."). Defendants did not change any substantive component of the Rule. *See id.* at 73,735. They committed to issuing a report within five years on the Rule's economic impacts and conservation value. *Id.* at 73,734.

Defendants released that report in January 2021. *See supra* n.2. It showed that the number of documented right whale mortalities and serious injuries from vessel strikes decreased from 12 during the decade prior to the Rule's implementation to eight in the decade since implementation. *Id.* at i. "This overall decline demonstrates progress but also indicates additional

action is warranted to further reduce the threat of vessel collisions." *Id.*
Moreover, a "review of navigational safety revealed no indication of impacts
from implementation of the speed rule. *Id.* Finally, "the yearly cost to
industry is estimated to be $28.3 to $39.4 million annually, with the majority
of the cost (58-70%) borne by the container ship sector." *Id.*

## ARGUMENT

Conservation Groups are entitled to intervene as of right. They have
legally protectable interests in protecting right whales from vessel strikes.
These interests are threatened by Plaintiffs' lawsuit. The Groups are not
adequately represented by any other party. They seek a voice to ensure that
this Court is fully informed regarding the solid statutory bases for the Vessel
Speed Rule and to defend their unique interests in right whale
conservation.[10] In the alternative, Conservation Groups qualify for
permissive intervention.

## I.    Conservation Groups Are Entitled to Intervene as of Right

Under Federal Rule of Civil Procedure 24(a), a court "must" allow a
party to intervene as of right when: (1) the motion to intervene "is timely;" (2)
the movant "has an interest relating to the property or transaction which is

---

[10] Conservation Groups need not demonstrate Article III standing to intervene because
"there exists a justiciable case or controversy between the parties already in the lawsuit."
*Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1336 (11th Cir. 2007) (quoting *Chiles v.
Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989)). Nevertheless, the declarations
submitted herewith demonstrate Conservation Groups' and their members' standing.

the subject of the action"; (3) the movant "is so situated that disposition of the action, as a practical matter, may impede or impair [the movant's] ability to protect that interest"; and (4) the movant's "interest is represented inadequately by the existing parties to the suit." *Chiles*, 865 F.2d at 1213. "Any doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors[.]" *Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993). Once a movant has shown it meets these requirements, the court has "no discretion to deny the intervention." *Loyd v. Ala. Dep't of Corr.*, 176 F.3d 1336, 1340–41 (11th Cir. 1999). Conservation Groups satisfy these requirements.

### A. Conservation Groups' Motion is Timely

Because this litigation is in its earliest stage, Conservation Groups' motion is timely. Courts in this circuit consider timeliness based on "all the circumstances," including: (1) the length of time during which the prospective intervenor "actually knew or reasonably should have known" of its interest in the litigation before it moved to intervene; (2) any prejudice that existing parties may suffer from the prospective intervenor's failure to intervene "as soon as he actually knew or reasonably should have known of his interest in the case"; (3) the prejudice that the prospective intervenor would suffer if the motion were denied, and; (4) any unusual circumstances militating for or against a determination that the motion is timely. *Stallworth v. Monsanto*

14

*Co.*, 558 F.2d 257, 263–266 (5th Cir. 1977). Courts consistently find intervention at early stages timely because it avoids prejudicing existing parties. *See, e.g.*, *FUFC, LLC v. Cers Envtl. Serv., Inc.*, No. 19-231, 2019 WL 12323498, at *2 (M.D. Fla. June 13, 2019); *USAA Life Ins. Co. v. Doss*, No. 15-93, 2016 WL 877843, at *2 (M.D. Fla. Jan. 29, 2016); *Almengor v. City of Jacksonville*, No. 11-116, 2011 WL 845835 (M.D. Fla. Mar. 8, 2011).

Conservation Groups' timely motion comes one week after Plaintiffs filed suit. Defendants have not entered an appearance. At this early stage, intervention will not prejudice any party. *See, e.g.*, *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259–60 (11th Cir. 2002); *Chiles*, 865 F.2d at 1213. Conversely, Conservation Groups will suffer prejudice should this Court deny intervention, rendering them unable to defend the validity of the Vessel Speed Rule or appeal any adverse decision. No "unusual circumstances" militate against a timeliness finding.

### B. Conservation Groups Have a Substantial Interest in the 2008 Vessel Speed Rule Protecting Right Whales

Conservation Groups have a "direct, substantial, legally protectable interest in the proceeding," which exists because they are "real parties in interest in the transaction which is the subject of the proceeding." *Chiles*, 865 F.2d at 1213–14 (cleaned up). This requirement "is a flexible one, which

focuses on the particular facts and circumstances surrounding each motion for intervention." *Id*. at 1214 (cleaned up).

Conservation Groups satisfy this requirement because (1) their members have protected interests in the right whale; and (2) they have steadfastly worked to protect the right whale from vessel strikes for years.

Conservation Groups' members enjoy and deeply value being able to see and experience right whales. They travel specifically to view, study, or photograph right whales. *See* Asmutis-Silvia Decl. ¶¶ 12–13, 29 (Ex. 1); Senatore Decl. ¶ 6, (Ex. 2); Mahoney Decl. ¶ 7 (Ex. 3); Patek Decl. ¶¶ 7–11 (Ex. 4); Sakashita Decl. ¶ 4 (Ex. 5); Bartlett Decl. ¶¶ 3–7 (Ex. 6). These members have plans to continue seeking to experience right whales in the future. *See* Ex. 2 ¶¶ 13, 29; Ex. 4 ¶ 10; Ex. 6 ¶ 8. They also have scientific, conservation, and professional interests in right whales. *See* Ex. 1 ¶¶ 14–27; Ex. 4 ¶¶ 4–6, 11–12; Ex. 6 ¶¶ 7, 9.

Conservation Groups thus have a "direct, substantial, and legally protectable" interest in this proceeding. *See* Ex. 7, Order, *Colosi v. Charlotte Cty.*, No. 24-1004, at 4–6 (M.D. Fla. Feb. 26, 2025) (conservation groups showed legally protectable interest supporting intervention in suit asserting ESA claims concerning threatened bird where groups' members established interests in bird and where groups have history of advocating to protect bird); *Nat'l Parks Conserv. Ass'n v. U.S. Dep't of Interior*, No. 11-578, 2012 WL

16

1060144, at *3 (M.D. Fla. Mar. 29, 2012) (interest in enjoying nature preserve legally protectable); *S. Dade Land Corp. v. Sullivan*, 155 F.R.D. 694, 696 (S.D. Fla. 1994) (interest in "wildlife conservation and enjoyment of the Park's natural resources" legally protectable); *Miccosukee Tribe of Indians of Fla. v. United States*, No. 05-23045, 2006 WL 8432717, at *1 (S.D. Fla. May 15, 2006) (interest in endangered species protection legally protectable); *cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992) ("the desire to use or observe an animal species, even for purely [a]esthetic purposes, is undeniably a cognizable interest").

Conservation Groups also satisfy Rule 24(a)'s interest requirement because they are organizations dedicated to conserving imperiled wildlife, including the right whale. To that end, they have advocated for years for the Vessel Speed Rule to be promulgated and, subsequently, for its protections to be extended based on the best available scientific data. *See* Ex. 1 ¶¶ 37, 39–41; Ex. 2 ¶¶ 5, 7–9, 12, 14–18; Ex. 3 ¶¶ 5–7, 9, 12–16, 22; Ex. 5 ¶¶ 3–15.

This significant history of advocacy on the Vessel Speed Rule and subsequent efforts to extend the scope of the Rule's protections establish Conservation Groups' direct, substantial, legally protectable interest. This extends to their ability to rely on Defendants' vigorous and effective enforcement of the Rule by imposing civil penalties to punish violators and to deter future violations.

17

### C. The Disposition of this Case May Impair Conservation Groups' Ability to Protect Their Interests

Conservation Groups' interests in protecting right whales from vessel strikes will be impaired if Plaintiffs succeed in this lawsuit. To meet the impairment requirement, movants need only show that "disposition of the action, as a practical matter, *may* impede or impair [the movant's] ability to protect [its] interest." *Chiles*, 865 F.2d at 1213 (emphasis added); *see also Stone v. First Union Corp.*, 371 F.3d 1305, 1309–11 (11th Cir. 2004). This requirement is met where a movant shows it would be "practically disadvantaged by [its] exclusion from the proceedings." *Salvors, Inc. v. Unidentified Wrecked & Abandoned Vessel*, 861 F.3d 1278, 1295 (11th Cir. 2017) (citation omitted).

A ruling for Plaintiffs would cause severe practical harm to Conservation Groups' interest in protecting the right whale from vessel strikes via the Vessel Speed Rule. Plaintiffs seek a "permanent prohibitory injunction setting aside the Initial Decision and civil penalty and forbidding Defendants from enforcing the Initial Decision or civil penalty." *See* ECF No. 1 at 11–12 (request for relief). They allege that Defendants' issuance of the Rule exceeded their statutory authority under the ESA and MMPA, *id.* ¶¶ 43–52 (Count I); or, in the alternative, that if the ESA and MMPA provide

Defendants with the requisite authority to issue the Rule, the statutes constitute an unlawful delegation of authority, in violation of the U.S. Constitution, *id.* ¶¶ 53–62 (Count II). To rule for Plaintiffs, the Court must find for Plaintiffs on one of these claims.

The precedent set by a ruling for Plaintiffs would likely impede or eviscerate vessel strike protections for the right whale, directly impairing Conservation Groups' and their members' protectable interests in the species' survival and recovery. *See supra* Section I.B. A ruling for Plaintiffs would potentially nullify Defendants' ability to enforce the Rule against future violators and to deter future violations f, potentially depriving the Rule of all meaning. It would also potentially prevent Defendants from expanding the Rule in the future. These outcomes would obviate Conservation Groups' years of litigation and advocacy work to protect right whales from vessel strikes.

More broadly, Plaintiffs' success would undermine the most powerful statutory tools Conservation Groups rely upon in advocacy—the ESA and the MMPA—to prevent the right whale's and other species' extinction and to promote their recovery. *See* Ex. 1 ¶ 6, 18; Ex. 2 ¶¶ 7, 9, 11, 13; Ex. 3 ¶¶ 6, 13, 22; Ex. 5 ¶¶ 5, 13, 14; *see also* Ex. 7, Order, *Colosi v. Charlotte Cty.*, No. 24-1004, at 6–7 (M.D. Fla. Feb. 26, 2025) (where plaintiff's suit could void ESA protections for threatened bird, conservation groups and members met impairment requirement for intervention).

### D. Conservation Groups' Interests Are Not Adequately Represented by Any Existing Party

Finally, Conservation Groups readily satisfy the requirement that no existing party adequately represent their interests. While this Circuit presumes the interests of intervenors are adequately represented when existing parties seek to achieve the "same objectives as would-be intervenors," this presumption is "weak" and "merely imposes upon the proposed interveners the burden of coming forward with some evidence to the contrary." *Clark v. Putnam Cnty.*, 168 F.3d 458, 461 (11th Cir. 1999). Intervenors need only show that the current parties' representation "*may* be inadequate; and the burden for making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (emphasis added) (citation omitted). In this circuit, intervenors "should be allowed to intervene *unless it is clear* that [other parties] will provide adequate representation." *Chiles*, 868 F.2d at 1214 (emphasis added) (citation omitted).

Courts have "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003). Indeed, one court in this district rejected a finding that a prospective intervenor's interests were adequately represented where "the Government's position is the same

as the Intervenors." *See Coastal Conserv. Ass'n v. Locke*, No. 9-641, 2010 WL 1407681, at *5 (M.D. Fla. Jan. 19, 2010), *report and recommendation rejected in relevant part*, 2010 WL 1407680, at *2 (M.D. Fla. Apr. 6, 2010). The court explained that "the government's general interest in getting a difficult situation resolved properly may not result in adequate representation to [an intervenor's] specific interest." 2010 WL 1407680, at *2.

The Ninth and Tenth Circuits have held that the government is unlikely to adequately represent a movant where there has been prior litigation on the same or related issues where the movant and government were on opposing sides. *See Cnty. of Fresno v. Andrus*, 622 F.2d 436, 439 (9th Cir. 1980) ("there is further reason to doubt that the [agency] will fully protect [the applicant's] interest . . . in light of the fact that the [agency] began its rulemaking only reluctantly after [the applicant] brought a law suit against it."); *Coal. of Ariz./N.M. Ctys. v. Dep't of Interior*, 100 F.3d 837, 845 (10th Cir. 1996) (agency's "ability to adequately represent [the applicant] . . . is made all the more suspect by its reluctance in protecting the [species], doing so only after [the applicant] threatened, and eventually brought, a law suit to force compliance with the Act").

Conservation Groups have been at odds with Defendants over their failures to protect right whales from vessel strikes for many years. Between 1999 and 2008, several Groups took Defendants to court over their extended

21

delay in acting to reduce vessel strikes. Ex. 2 ¶ 12. Conservation Groups subsequently petitioned Defendants to expand the Vessel Speed Rule in 2012 and again in 2020 based on evidence that right whales needed additional vessel strike protections. *See* Ex. 1 ¶¶ 38–39; Ex. 2 ¶¶ 14, 17; Ex. 3 ¶ 22; Ex. 5 ¶ 9. When Defendants failed to respond, Conservation Groups sued to challenge their unreasonable delay. *See Whale and Dolphin Conserv. v. Nat'l Marine Fisheries Serv.*, No. 21-112 (D.D.C.). Conservation Groups' history of having to sue Defendants over their failures to respond to petitions to establish and expand the Rule makes it unlikely they will adequately represent the Groups' interests here.

The recent change in presidential administration further suggests that Defendants may not adequately represent Conservation Groups' interests. The Tenth Circuit has held that a change in presidential administration "raises the possibility of divergence of interest." *Western Energy All. v. Zinke*, 877 F.3d 1157, 1169 (10th Cir. 2017) (cleaned up). The current administration has already staked out its interest in limiting the reach of the ESA and MMPA and in identifying regulations implementing these statutes for suspension, revision, or rescission. Ex. 2 ¶ 19. If it determines that the Vessel Speed Rule is at odds with its current policy objectives, it may not share Conservation goal of mounting a vigorous legal defense. While

Defendants have not yet asserted their position, this administration change casts additional doubt on the adequacy of their representation.

Finally, as shown above in Section I.B, Conservation Groups' interests as organizations dedicated to conserving imperiled wildlife, including the right whale, under the ESA and MMPA and Conservation Groups' members' individual aesthetic, recreational, scientific and professional interests in right whales are such that Defendants cannot adequately represent them.

## II.    Alternatively, the Court Should Grant Permissive Intervention

In the alternative, the Court should grant Conservation Groups permissive intervention under Rule 24(b). Permissive intervention is appropriate when (1) a movant files a timely motion; and (2) the prospective intervenor "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). The analysis for the timeliness requirement for permissive intervention is identical to that for intervention by right; it focuses on balancing prejudice of existing parties and would-be intervenors. *United States v. Jefferson City*, 720 F.2d 1511, 1516 (11th Cir. 1983). Conservation Groups satisfy this test.

This motion at the earliest stage of this case is timely and will not prejudice any party. *See supra* Section I.A. Conservation Groups do not intend to assert any cross-claims or counterclaims. They will present legal defenses relevant to the central issues: the lawfulness of the Vessel Speed

Rule under the ESA and MMPA and those statutes' constitutional delegations of authority to Defendants to effectuate their conservation purposes. *See id.*; *see also Fla. Wildlife Fed'n, Inc. v. Johnson*, No. 8-324, 2009 WL 248078, at *1, *3 (N.D. Fla. Feb. 2, 2009) (granting permissive intervention where "it is clear that the movants' positions share common questions of law and fact with the [action]" and "the action will not be delayed because of their intervention [and] will not prejudice the existing parties."). Permissive intervention under Rule 24(b) is warranted.

## CONCLUSION

Conservation Groups respectfully request that this Court grant their Motion to Intervene.

## LOCAL RULE 3.01(g) CERTIFICATION

Proposed Defendant-Intervenors certify that they conferred with Plaintiffs' counsel on March 18, 2025, via email. Plaintiffs oppose this motion. Defendants' counsel have not yet entered an appearance.

Respectfully submitted this 21st day of March, 2025,

/s/ *Elise Pautler Bennett*
Elise Pautler Bennett (FL Bar No. 106573)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
(727) 755-6950 (tel)
ebennett@biologicaldiversity.org

24

Kristen Monsell (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7137 (tel)
kmonsell@biologicaldiversity.org

Jane P. Davenport (*pro hac vice*)
DEFENDERS OF WILDLIFE
1130 17th St NW Washington, DC 20036
(202) 682-9400 (tel)
jdavenport@defenders.org
*Lead Counsel*

Erica A. Fuller (*pro hac vice*)
CONSERVATION LAW FOUNDATION
62 Summer St
Boston, MA 02110
(617) 850-1727 (tel)
efuller@clf.org


*Attorneys for Proposed Defendant-Intervenors Whale and Dolphin Conservation, Defenders of Wildlife, Conservation Law Foundation, and Center for Biological Diversity*