# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**GERALD L. EUBANKS**, et al.,

              Plaintiffs,

     v.

**HOWARD LUTNICK**, in his official capacity as
Secretary of the United States Department of
Commerce, et al.,

              Defendants.

No. 8:25-cv-00614-CEH-AAS

**PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................................................................ii

BACKGROUND................................................................................................. 1

ARGUMENT..................................................................................................... 3

    I.    The Endangered Species Act Does Not Support the Speed Rule ................... 3

        A.    The Speed Rule Does Not Enforce the ESA ........................................... 4

        B.    The Speed Rule Adds to the ESA's Prohibitions.................................... 7

        C.    The Speed Rule Is an Invalid Categorical Regulation ........................... 9

        D.    Any Ambiguities Must Be Construed in Plaintiffs' Favor..................... 16

    II.    The Marine Mammal Protection Act Does Not Support the Speed Rule .. 17

    III.    The Speed Rule Decides a Major Question ............................................. 19

    IV.    Alternatively, the MMPA or ESA Violates the Nondelegation Doctrine... 21

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ...................................................................................... 21, 23

*Ala. Ass'n of Realtors v. Dep't of HHS*,
  594 U.S. 758 (2021) ........................................................................................ 19

*Am. Trucking Ass'ns v. United States*,
  344 U.S. 298 (1953) ......................................................................................... 7

*Catalyst Pharms., Inc. v. Becerra*,
  14 F.4th 1299 (11th Cir. 2021) ....................................................................... 4

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*,
  466 F.3d 134 (D.C. Cir. 2006) ..................................................................... 7–8

*D. Ginsberg & Sons, Inc. v. Popkin*,
  285 U.S. 204 (1932) ....................................................................................... 18

*DHS v. Regents of Univ. of Cal.*,
  591 U.S. 1 (2020) ........................................................................................... 18

*FCC v. American Broadcasting Co.*,
  347 U.S. 284 (1954) ............................................................................... 8–9, 16

*FCC v. Consumers' Research*,
  145 S. Ct. 2482 (2025) ............................................................................. 21–23

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
  353 U.S. 222 (1957) ....................................................................................... 18

*Hornbeck Offshore Servs., L.L.C. v. Salazar*,
  696 F. Supp. 2d 627 (E.D. La. 2010) ............................................................ 24

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004) ........................................................................................... 16

*MCI Telecomms. Corp. v. AT&T*,
  512 U.S. 218 (1994) .................................................................................. 7, 20

*Mistretta v. United States*,
    488 U.S. 361 (1989) ................................................................................ 23

*Morrill v. Jones*,
    106 U.S. 466 (1883) ................................................................................. 9

*NFIB v. OSHA*,
    595 U.S. 109 (2022) ............................................................................... 20

*Panama Refin. Co. v. Ryan*,
    293 U.S. 388 (1935) ......................................................................... 21, 23

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ............................................................................... 18

*Ragsdale v. Wolverine World Wide, Inc.*,
    535 U.S. 81 (2002) .......................................................................... *passim*

*Regions Bank v. Legal Outsource PA*,
    936 F.3d 1184 (11th Cir. 2019) .................................................... 16–17, 23

*Sackett v. EPA*,
    598 U.S. 651 (2023) ............................................................................... 24

*Touby v. United States*,
    500 U.S. 160 (1991) ............................................................................... 25

*United States v. Calamaro*,
    354 U.S. 351 (1957) ................................................................................. 9

*United States v. Hansen*,
    599 U.S. 762 (2023) ............................................................................... 17

*United States v. Palomar-Santiago*,
    593 U.S. 321 (2021) ............................................................................... 17

*United States v. Thompson/Center Arms Co.*,
    504 U.S. 505 (1992) ............................................................................... 16

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................................... 19

*Wayman v. Southard*,
    23 U.S. 1 (1825) .................................................................................... 21

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ........................................................................... 20

*Whitman v. American Trucking Ass'ns,*
    531 U.S. 457 (2001) ........................................................................... 23

*Yakus v. United States,*
    321 U.S. 414 (1944) ........................................................................... 23

## Constitutional Provisions

U.S. Const. art. I, § 1 ......................................................................... 21

## Statutes

5 U.S.C. § 704 ........................................................................................ 3

5 U.S.C. § 706 ........................................................................................ 1

16 U.S.C. § 703(a) ............................................................................... 24

16 U.S.C. § 712(2) ............................................................................... 24

16 U.S.C. § 1362(13) ............................................................................. 5

16 U.S.C. § 1362(18)(a)(i) ..................................................................... 5

16 U.S.C. § 1372 ................................................................................. 17

16 U.S.C. § 1373 ................................................................................. 18

16 U.S.C. § 1373(a) ............................................................................. 18

16 U.S.C. § 1374 ................................................................................. 17

16 U.S.C. § 1375(b) ............................................................................. 17

16 U.S.C. § 1382(a) ....................................................................2, 17–18, 20

16 U.S.C. § 1532(19) ........................................................................2–3

16 U.S.C. § 1538 ................................................................................... 8

16 U.S.C. § 1538(a)(1) ......................................................................2–3

16 U.S.C. § 1539 ................................................................................... 5

16 U.S.C. § 1539(a)(1)(B) ........................................................................ 4

16 U.S.C. § 1540(b) ............................................................................... 16

16 U.S.C. § 1540(b)(1) ........................................................................... 14

16 U.S.C. § 1540(f) ......................................................................... *passim*

25 U.S.C. § 2702(2) ................................................................................. 8

## Regulations

15 C.F.R. § 904.273(c) ............................................................................. 3

50 C.F.R. § 229.2 ................................................................................... 13

87 Fed. Reg. 21,783 (Apr. 13, 2022) ...................................................... 24

87 Fed. Reg. 46,921 (Aug. 1, 2022) .......................................... 19–20, 22

## Rules

Fed. R. Civ. P. 56 .................................................................................... 1

## Other Authorities

*Enforce*, Black's Law Dictionary (12th ed. 2024) ..................................... 4

FAA, *Wildlife Strikes to Civil Aircraft in the United States, 1990–2024* (June 2025), https://www.faa.gov/airports/airport_safety/ wildlife/wildlife-strike-report-1990-2024; ........................................ 24

*Future of the Marine Mammal Protection Act: Hearing Before the Senate Subcomm. on Oceans, Fisheries, and Coast Guard*, 108th Cong. (July 16, 2003) ("Senate Hearing"), https://www.congress.gov/108/chrg/CHRG-108shrg88893/CHRG-108shrg88893.pdf ........................................... 5

Marine Mammal Protection Act of 2004, H.R. 2693, 108th Cong. (2004), https://www.congress.gov/bill/108th-congress/house-bill/2693/text/rh .......................................................... 6, 15, 17, 21

Marine Mammal Protection Act Amendments of 2003, H.R. 2693 § 13, 108th Cong. (2003), https://www.congress.gov/bill/108th-congress/house-bill/2693/text/ih ...................................................... 6

*Marine Mammal Protection Act Amendments of 2003: Hearings on H.R. 2693 Before the Subcomm. on Fisheries Conserv., Wildlife & Oceans*, 108th Cong., 2003 WL 21734282 (2003) .................................................................... 6

NOAA, *NOAA, BOEM Announce Final North Atlantic Right Whale and Offshore Wind Strategy* (Jan. 25, 2024), https://www.noaa.gov/news-release/noaa-boem-announce-final-north-atlantic-right-whale-and-offshore-wind-strategy ..................................................................................... 20

This case presents a straightforward question of law: did Congress authorize the National Oceanic and Atmospheric Administration ("NOAA") to impose sweeping speed restrictions on vessels along the East Coast? The "Speed Rule" requires vessels longer than 65 feet to limit speeds to 10 knots during certain times and places on the East Coast. This measure, meant to protect right whales from vessel strikes, was issued under the Endangered Species Act ("ESA") and Marine Mammal Protection Act ("MMPA"), which prohibit the "taking"—that is, the harming—of designated species. But the statutes stop short of prohibiting activities, like traveling faster than 10 knots, that merely carry the potential of resulting in a take. The Speed Rule is thus *ultra vires*. NOAA itself recognized this in 2003, when it told Congress that the threat of vessel strikes required amending the MMPA to forbid actions that have the "potential" to harm right whales. Congress said no, but NOAA issued the Speed Rule anyway.

In 2022, Plaintiff Captain Gerald Eubanks, piloting a recreational vessel, was cited under the Speed Rule and assessed a $14,250 civil penalty for a routine oceanic transit that encountered no whales. The citation and penalty should be set aside, however, because the rule exceeds statutory authority or, in the alternative, the statutes represent an unconstitutional delegation of legislative power, because there would be no limit to what NOAA might prohibit in the name of conservation.

Because the Speed Rule is invalid, the Court should grant summary judgment for Plaintiffs, Fed. R. Civ. P. 56, and set aside the citation and penalty, 5 U.S.C. § 706.

## BACKGROUND

The North Atlantic right whale is an endangered species under the ESA and a

depleted marine mammal under the MMPA. NOAA identified vessel strikes as a key threat, with lethality of a collision increasing above 10 knots. NMFS_011613–15.[1] Vessel strikes are unlawful under the ESA, which prohibits taking protected species, 16 U.S.C. § 1538(a)(1), including harming them, § 1532(19). But NOAA wanted Congress to go further and, as detailed below, lobbied Congress to prohibit activities, like moving above 10 knots, that simply could result in harm.

When Congress declined, NOAA promulgated the Speed Rule anyway, claiming authority under the general rulemaking provisions of the ESA and MMPA, §§ 1382(a), 1540(f). NMFS_004774. The rule imposed a 10-knot speed limit on vessels 65 feet or longer while transiting designated Seasonal Management Areas ("SMAs") along the Atlantic seaboard during specified times of year. NMFS_004765–66. The rule, originally set to expire in 2013, was made permanent in 2014. NMFS_005032.

In December 2022, Captain Eubanks piloted the *M/V Determination III*, a vessel owned by Plaintiff Determination III 130 Westport, LLC, through active SMAs from Florida to South Carolina. He exceeded 10 knots over 200 miles to maintain vessel stability in sea conditions. NOAA_001348–49. The vessel encountered no whales, perhaps due to Captain Eubanks' precautions: he trained his crew to recognize right whales, posted additional lookouts to spot any right whales, and scheduled travel during daylight hours. NOAA_001392.

Although Plaintiffs had no prior violations and cooperated with the agency,

---

[1] NMFS_xxxx and NOAA_xxxx citations refer to the administrative record.

2

NOAA cited them in October 2023, assessing a $15,000 civil penalty. NOAA_000004–08. Plaintiffs sought administrative review, arguing the Speed Rule was *ultra vires* or, in the alternative, rested on an unconstitutional delegation. The ALJ declined to address the rule's validity and found Plaintiffs liable but reduced the penalty to $14,250 to reflect Plaintiffs' cooperation. NOAA_001972–002000. The Administrator denied review, making the ALJ decision final. 15 C.F.R. § 904.273(c); 5 U.S.C. § 704.

In March 2025, Plaintiffs sought review in this Court on the same theories presented to the ALJ. ECF No. 1, ¶¶ 46, 54. With the administrative record closed and facts undisputed, Plaintiffs now move for summary judgment on these legal questions.

## ARGUMENT

The citation and civil penalty should be set aside because the Speed Rule is unlawful. Neither the ESA nor the MMPA authorizes the regulation. And, if either statute authorizes it, that statute delegates lawmaking power in violation of Article I of the Constitution.

## I.   The Endangered Species Act Does Not Support the Speed Rule

Congress enacted the ESA to protect threatened and endangered species by forbidding the "take" of protected species, such as the right whale. 16 U.S.C. § 1538(a)(1). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." § 1532(19). Congress also criminalized actions downstream of a take, such as selling, transporting, or importing the animal. § 1538(a)(1). The Secretary of Commerce is authorized "to promulgate such regulations as may be appropriate to enforce" these prohibitions and

3

other parts of the ESA. § 1540(f). But that authority does not extend to the Speed Rule.

### A.    The Speed Rule Does Not Enforce the ESA

A rule issued under § 1540(f) must "enforce" the ESA. Courts "interpret words that are not defined in a statute with their ordinary and plain meaning[.]" *Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1307 (11th Cir. 2021) (citation omitted). "Enforce" means "[t]o give force or effect to (a law, etc.); to compel obedience to." *Enforce*, Black's Law Dictionary (12th ed. 2024).

The Speed Rule does not "enforce" the ESA because it does not give effect to, or compel obedience to, any provision of the ESA. The ESA prohibits taking, transporting, or selling a right whale, but the Speed Rule forbids an activity that *might* result in take—even when no take occurs. Indeed, Mr. Eubanks's unremarkable voyage undisputedly encountered no right whales. NOAA_001974. These facts—that Mr. Eubanks violated the Speed Rule *without* taking a right whale—demonstrates that the Speed Rule creates a new prohibition rather than enforces the ESA's prohibitions.

Congress consciously did not prohibit actions that merely might result in take. It provided that, when a person plans to take an action that might result in take, he may apply in advance for a so-called incidental-take permit, which excuses any resulting takes. § 1539(a)(1)(B). Critically, Congress did not *require* individuals to obtain an incidental-take permit before undertaking activities that can result in take. Individuals are thus left free to assess the risk of take and proceed without a permit, knowing that if a take does result, the consequences are severe. In short, the ESA regulates outcomes, not possibilities. By banning an activity that merely can result in

4

take, the Speed Rule reverses, rather than enforces, § 1539.

Further, although NOAA relied on § 1540(f)'s authorization to "enforce" the ESA, the agency did not identify any provision of the ESA that the Speed Rule enforces. *See generally* NMFS_004765. This is because the agency knew that no statute authorized an oceanic speed limit. Before issuing the Rule, NOAA and the Fish and Wildlife Service asked Congress for amendments to the MMPA that would have authorized vessel-speed regulations. NOAA official Rebecca Lent testified that the proposed bill would allow agencies to "reduce the occurrence of ship strikes on whales, a very big concern for right whales." *Future of the Marine Mammal Protection Act: Hearing Before the Senate Subcomm. on Oceans, Fisheries, and Coast Guard*, 108th Cong., at 4 (July 16, 2003) ("Senate Hearing"), https://www.congress.gov/108/chrg/CHRG-108shrg88893/CHRG-108shrg88893.pdf.

NOAA's argument to Congress was just as urgent as the one it will submit to this Court. Right whales, officials explained, are "critically endangered" and "vulnerable to extinction," with only a small number left. *Id.* at 7, 23 (testimony of Dr. Lent and the Marine Mammal Commission's Executive Director). They stressed that many mortalities "were due to ship strikes," which "requir[e] priority attention." *Id.*

The agencies' proposal would have allowed NOAA to regulate vessel speeds by expanding the MMPA's definition of "harassment," a kind of take. § 1362(13). Harassment means, as relevant, "any act of pursuit, torment, or annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild." § 1362(18)(a)(i). "We have had," Dr. Lent testified, "some difficulties with the

interpretation of the current definition because . . . it is limited to acts that involve pursuit, torment, or annoyance." Senate Hearing at 3. Because of these limits, the definition could not reach actions that merely "has the potential to injure a marine mammal," like piloting a vessel above 10 knots. Thus, NOAA proposed "eliminat[ing] that phrase of 'pursuit, torment, or annoyance.'" Senate Hearing at 4.

Congress considered the request. A bill was introduced that would have expanded harassment to include "any act that . . . has the probability to injure" a marine mammal. Marine Mammal Protection Act Amendments of 2003, H.R. 2693 § 13, 108th Cong. (2003), https://www.congress.gov/bill/108th-congress/house-bill/2693/text/ih. But even that was not enough to regulate vessel speeds. The Fish and Wildlife Director objected that requiring a "probability" of harm "would not apply to some activities that may have negative impacts on marine mammals." *Marine Mammal Protection Act Amendments of 2003: Hearings on H.R. 2693 Before the Subcomm. on Fisheries Conserv., Wildlife & Oceans*, 108th Cong., 2003 WL 21734282 (2003). To wit, vessel strikes on right whales are exceeding remote. *See infra*. To support a speed limit, the agencies needed Congress to prohibit activities with *any* risk of harming marine mammals. Thus, when the bill was reported to the House, the harassment definition was amended to include "any act that . . . has the potential to injure a marine mammal or marine mammal stock in the wild." Marine Mammal Protection Act of 2004, H.R. 2693, 108th Cong. (2004), https://www.congress.gov/bill/108th-congress/house-bill/2693/text/rh. That bill would have authorized speed limits. It did not pass.

NOAA was undeterred. Less than two months later, the agency announced its

intent to impose speed limits under the very statute that it had just told Congress was inadequate. NMFS_002433. Even in the final rule, the agency justified its proscription on the need to *extend* the ESA and MMPA. NMFS_004768 ("[U]nder these statutes, it is illegal to strike a right whale with a ship. Nonetheless, there is a role for rigorous and effective measures to minimize the risk of illegal takings of right whales resulting from ship collisions . . . ."). That is not enforcement of the ESA.

### B.    The Speed Rule Adds to the ESA's Prohibitions

Rather than carrying out the ESA's take prohibition, the Speed Rule creates a new prohibition. This exceeds the agency's power.

It is settled that "[a]n agency's general rulemaking authority" is "'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate and prescribed, for the pursuit of those purposes.'" *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006) (quoting *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994)). General grants of authority must be "geared to and bounded by the limits of the regulatory system of the Act which it supplements." *Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 313 (1953).

In *Colorado River*, the National Indian Gaming Commission issued regulations to protect the fairness of Indian casino gambling, including "standards for individual games" and "customer credit." 466 F.3d at 136. The Gaming Commission invoked its general authority to "'promulgate such regulations . . . as [it] deems appropriate to implement the provisions' of the [Indian Gaming Regulatory] Act." *Id.* at 137. The regulations, the agency argued, furthered the "congressional purpose to promote

7

integrity in Indian gaming," *id.* at 139, which included shielding Indian gaming "from organized crime and other corrupting influences" and "to assure that gaming is conducted fairly and honestly by both the operator and players," 25 U.S.C. § 2702(2).

The appeal to the purpose statement was insufficient. Even though the rulemaking authority was broadly worded, the statute showed "that Congress wanted to ensure the integrity of Indian gaming . . . in a particular way." *Colorado River*, 466 F.3d at 140. Specifically, Congress had chosen to regulate casino gaming through tribal-state compacts. *Id.* at 140. Because Congress selected that mechanism to accomplish its purpose, the agency could not layer on its own mechanisms. *Id.*

This reasoning applies here. Section 1540(f) authorizes NOAA to issue rules "to enforce" the ESA, but that authority is "bound" by the "the means [Congress] has deemed appropriate and prescribed, for the pursuit of [the ESA's] purposes." *Id.* at 139. The approved means are the prohibition of take and downstream activities. § 1538. Congress chose not to proscribe conduct that *could*—but does not—result in take. We know this was a conscious choice because Congress allowed, but *did not require*, individuals to seek a permit before undertaking activities that could result in take. Because the Speed Rule regulates conduct that Congress chose not to proscribe, it is not an enforcement measure. Rather, it is a new prohibition and thus *ultra vires*.

The case here mirrors *FCC v. American Broadcasting Co.*, 347 U.S. 284 (1954), which held that agencies cannot prohibit by rule that which is not illegal under statute. The statute there prohibited broadcasting lotteries and gave FCC general rulemaking

8

authority to "carry out the provisions of the chapter." *Id.* at 289 n.7. FCC was concerned with give-away programs, which, though not technically lotteries, reflected "the old lottery evil" in that they "appeal[] to cupidity and the gambling spirit." *Id.* at 296. Like NOAA, FCC "without success . . . urged Congress to amend the law to specifically prohibit" the giveaways. *Id.* at 298. Instead of acquiescing to Congress's denial, FCC, like NOAA, "s[ought] to accomplish the same result through agency regulations" by banning giveaway broadcasts. *Id.* "In doing so, the Commission . . . exceeded its rule-making power," because the Commission's rulemaking power "is limited by the scope of the statute." *Id.* at 290. "Unless the 'give-away' programs involved here are illegal under [the statute], the Commission cannot employ the statute to make them so by agency action." *Id.* This case is directly applicable: unless moving above 10 knots in the relevant areas and times is illegal under the ESA—and it is not— NOAA cannot prohibit doing so by rule.

The Supreme Court has consistently rejected agencies' "attempted addition[s] to the statute of something which is not there." *United States v. Calamaro*, 354 U.S. 351, 359 (1957). Inserting "a limitation which congress did not think it necessary to prescribe" "could only be accomplished by an amendment of the law." *Morrill v. Jones*, 106 U.S. 466, 466 (1883). NOAA tried to obtain such an amendment. Congress, weighing the agency's best arguments in multiple hearings, chose not to broaden protections for the right whale. This Court should not overrule Congress.

### C.    The Speed Rule Is an Invalid Categorical Regulation

Even if the ESA permitted prophylactic regulations, the Speed Rule is still *ultra vires*. As a categorical regulation, the Speed Rule may prohibit only conduct that *usually* results in take or another prohibited action. But the conduct prohibited by the Speed Rule very rarely results in take.

The Supreme Court explained in *Ragsdale v. Wolverine World Wide, Inc.*, that "categorical rules"—those creating "*per se* . . . illegality"—are permissible only when they "reflect broad generalizations holding true in so many cases that inquiry into whether they apply to the case at hand would be needless and wasteful." 535 U.S. 81, 92–93 (2002). When the regulated conduct "does not usually present a pronounced risk" of the statutory harm, the rule creates a new prohibition instead of carrying out the statute. *Id.* at 93. In that case, the rule "effects an impermissible alteration of the statutory framework and cannot be within the Secretary's power to issue regulations 'necessary to carry out'" the statute. *Id.* at 96.

*Ragsdale* itself illustrates the point. There, the Department of Labor invoked its authority to issue regulations "necessary to carry out" the Family Medical Leave Act ("FMLA"), which guarantees eligible employees 12 weeks of leave. *Id.* at 86, 96. Concerned that employees might unknowingly exhaust their FMLA entitlement, the Department issued a rule requiring employers to notify an employee when leave would count toward the entitlement. *Id.* at 88. Absent notice, the leave could not count toward the entitlement, which would remain available to the employee. *Id.* The rule thus effectively "punishe[d] an employer's failure to provide timely notice . . . by

denying it credit for leave granted before the notice." *Id.*

The Court observed that the penalty was disconnected from any harm resulting from violating the regulation. *Id.* For example, the Court posited, an un-notified employee who *expects* his leave to exhaust his FMLA entitlement suffers no harm but still gets an extra 12 weeks. *Id.* Violating the regulation prejudices an employee only in "the most exceptional of cases." *Id.* at 93. "[I]n the run of cases," "the Secretary's penalty will have no substantial relation to the harm suffered by the employee." *Id.*

This was a problem because categorical rules are permitted only if they "reflect broad generalizations holding true in so many cases that inquiry into whether they apply to the case at hand would be needless and wasteful." *Id.* at 92–93. For such a rule to be valid, it must be "a fair assumption" that the generalization holds "in the run of cases." *Id.* at 93 (citation omitted). For example, in the antitrust context, a ban on "a particular restraint of trade" must "*usually* present a *pronounced* risk of injury to competition." *Id.* (emphasis added). Because the generalization—that an un-notified employee should have 12 more weeks—holds "in but a few cases," the rule effectively "amend[ed]" the statute and was *ultra vires. Id.* at 93, 96.

This case is similar. Under the Speed Rule, exceeding 10 knots in an SMA is *per se* illegal, including when no take occurs—just as failure to notify in *Ragsdale* was *per se* illegal even when a leave-taking employee expects to use his FMLA leave. The Speed Rule is therefore a categorical rule. Thus, to be lawful, the rule's generalization—that a vessel causes take when it violates the Speed Rule by exceeding

10 knots in an active SMA—must hold in the run of cases.

As in *Ragsdale*, that generalization is not "a fair assumption." *Id.* at 93 (citation omitted). The agency itself has concluded that "it is not possible to determine a direct causal link" between the Speed Rule and the number of right-whale takes. NOAA_001600. From 2009 to 2010 to 2011, compliance with the Speed Rule improved dramatically, NMFS_004884, yet right whale strikes increased from three injuries in 2009, to one mortality and four injuries in 2010, to one mortality, two serious injuries, and five other injuries in 2011, NOAA_001724. The 2011 figures reflect significantly more casualties than from 2002 to 2004 *combined*, *id.*, a time when large commercial ships transited "critical right whale habitats" at up to 22 knots on average, NMFS_003698–99 (Table 4-1). These are, of course, only a few data points. But a comprehensive NOAA study spanning 12 years of data concluded that there is only "a meager amount of evidence" that the rule has resulted in "fewer ship strike mortalities detected per annum." NMFS_004898. In other words, it is not a fair assumption that the Speed Rule has a strong connection to ship strikes.

A straightforward review of NOAA data shows that take occurs only in "the most exceptional of cases" of Speed Rule violations. *Ragsdale*, 535 U.S. at 93. NOAA data includes the number of miles transited in violation of the Speed Rule each year, as well as the number of right-whale strikes each year. Comparing the two yields a stark contrast: vessels annually traverse hundreds of thousands of miles in violation of the Speed Rule, but only a minuscule number of the vessels strike a whale.

From the 2008-2009 SMA season to the 2018-2019 season, 2.2 million nautical

miles were transited in violation of the Speed Rule, as shown in the table below.[2] In that time, vessel strikes during SMA seasons—both inside *and* outside of the SMA boundaries—caused four right-whale mortalities, four serious injuries, and 19 nonserious[3] injuries. Clearly, the conduct prohibited by the Speed Rule does not result in vessel strikes in the run of cases. The data, broken out by year, is unambiguous:

| SMA season (November 1 to July 31) | Total miles transited in active SMAs by vessels subject to Speed Rule[4] | Percent of miles in compliance[4] | Percent of miles in violation[5] | Total miles in violation[6] | Right whale vessel strikes during the season, inside *and* outside of SMAs[7] |
|---|---|---|---|---|---|
| 2008 to 2009 | 396,282 | 53.36% | 46.64% | 184,826 | 1 nonserious injury |
| 2009 to 2010 | 676,003 | 54.57% | 45.43% | 307,108 | 4 nonserious injuries 1 mortality |
| 2010 to 2011 | 687,516 | 66.53% | 33.47% | 230,112 | 4 nonserious injuries 2 serious injuries 1 mortality |
| 2011 to 2012 | 732,756 | 73.38% | 26.62% | 195,060 | 6 nonserious injuries |
| 2012 to 2013 | 758,688 | 76.37% | 23.63% | 179,278 | 3 nonserious injuries 1 serious injury |
| 2013 to 2014 | 732,791 | 76.28% | 23.72% | 173,818 | 1 serious injury |
| 2014 to 2015 | 752,490 | 76.61% | 23.39% | 176,007 | 2 injuries |
| 2015 to 2016 | 937,438 | 79.48% | 20.52% | 192,362 | 1 mortality |
| 2016 to 2017 | 987,425 | 79.34% | 20.66% | 204,002 | 1 mortality |
| 2017 to 2018 | 976,692 | 79.18% | 20.82% | 203,347 | 1 nonserious injury |
| 2018 to 2019 | 1,028,429 | 81.01% | 18.99% | 195,299 | None[8] |

---

[2] SMAs are active only between November 1 and July 31 of the following year. *See* NOAA_001616 ("[T]he SMA season 2012-2013 refers to SMAs active between November 1, 2012 and July 31, 2013."); NOAA_001734 (explaining structure of SMA seasons).

[3] A nonserious injury is one that will not "likely result in mortality." NOAA_001629 (quoting 50 C.F.R. § 229.2).

[4] NOAA_001662 (Figure 9); *see* NOAA_001618 (Figure 9 shows "[c]ompliance with the vessel speed rule . . . . for vessels subject to the rule.")

[5] Calculated by subtracting the prior column from 100%.

[6] Calculated by multiplying the second and fourth columns.

[7] NOAA_001724–25 (Table 2).

[8] NOAA_001632–33 (for data up to the 2017-2018 season); NOAA_001831–32 (showing that all casualties from November 1, 2018, to July 31, 2019, were either "EN" entanglements and not "VS"

Closer scrutiny only bolsters this conclusion. NOAA concluded that only two of the mortalities—and none of the serious injuries—occurred within SMAs. NOAA_001632–33 (numbers 7 and 8). (It did not analyze the nonserious injuries.) Even assuming both mortalities resulted from Speed Rule violations, that's fewer than one vessel-strike mortality or serious injury per 1 million miles transited in violation of the rule. But in fact, most vessel strikes do not result from Speed Rule violations; as a 2013 study relied on by NOAA found, 61% of strikes involve vessels shorter than 65 feet. NOAA_001625.

Even given that most strikes are not detected, NOAA_001841 ¶ 11, the Speed Rule's generalization—that its violation causes right-whale strikes—clearly does not hold in "the run of cases." "It is not a fair assumption . . . that this fact pattern will occur in any but the most exceptional of cases," *Ragsdale*, 535 U.S. at 93 (citation omitted). As the Fish and Wildlife Director alluded to in the MMPA amendment hearings, moving above 10 knots has only "the potential," but not even "the probability," of causing a vessel strike. *Supra.* Nevertheless, the Speed Rule imposes liability—up to one year's imprisonment and a $50,000 fine—even when *one* mile or one *foot* is transited above 10 knots without harm to a right whale. § 1540(b)(1). There is thus the same disconnection as in *Ragsdale* between the penalty (significant) and the harm the ESA and MMPA seek to prevent (which, in the run of cases, is no harm).

The data supports Plaintiffs, but precise analysis of the data is not actually

---

vessel strikes, or occurred in "CN" Canada instead of "US" United States). There is no data for non-serious injuries for the 2018-2019 season.

necessary. *Ragsdale*, for example, reached its conclusion based on common sense and "fair assumption[s]," not data analysis. 535 U.S. at 93. And everyone understands without being told that strikes are rare, whether one moves above or below 10 knots.

NOAA will not deny this, but the conservation problem is that even *one* incidental take is a significant loss for the right-whale stock. So, the agency believes, banning above-10-knot speeds is necessary for the species' survival, even if such speeds only very rarely result in take. But that concern must be addressed to Congress, not this Court. This Court applies the ESA, which prohibits only take and downstream actions. The statute simply does not extend as far as the agency wishes it did.

"[A]ny key term in an important piece of legislation" is "the result of compromise." *Ragsdale*, 535 U.S. at 93. In *Ragsdale*, "[e]mployers wanted fewer weeks" of entitled leave, while "employees wanted more." *Id.* at 94. Congress could have given employees 24 weeks, but it chose 12 weeks, and "[c]ourts and agencies must respect and give effect to these sorts of compromises." *Id.* Like the *Ragsdale* employees, NOAA wanted more protection for right whales. And Congress could have provided it; it could have forbidden all acts with "the potential to injure" a protected animal. Marine Mammal Protection Act of 2004, *supra*. But Congress rejected this expansion of liability. Instead, it proscribed only take and downstream activities. It backed that command with powerful penalties, including imprisonment. It encouraged, but did not require, people to obtain incidental-take permits when undertaking activities that could result in take. That was the compromise.

By extending the ESA's proscription, the Speed Rule "subverts th[is] careful

balance" and so "cannot be within the Secretary's power to issue regulations 'necessary to carry out' the" statute. *Ragsdale*, 535 U.S. at 94, 96. The Court "must respect and give effect to" Congress's compromise. *Id.* at 94. It must not "open[] vistas of liability that Congress did not envision." *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1196 (11th Cir. 2019) (citation omitted). It is not fair or lawful to punish Plaintiffs when they have taken no whale and their actions are lawful under the ESA.

### D.    Any Ambiguities Must Be Construed in Plaintiffs' Favor

For the Speed Rule to be authorized under the ESA, § 1540(f) must unambiguously support it. If there is an ambiguity, it should be resolved in Plaintiffs' favor under the rule of lenity and the principle of constitutional avoidance.

Where a single statute "has both civil and criminal applications," courts "must interpret the statute consistently, whether [they] encounter its application in a criminal or non-criminal context." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). Thus, the rule of lenity applies in civil cases where the statute has criminal applications. *Id.*; *American Broadcasting*, 347 U.S. at 286; *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 518 n.10 (1992) (plurality). The ESA and the Speed Rule have criminal applications, *see* § 1540(b), so the rule of lenity applies.

Constitutional avoidance also supports a limiting construction. If the Court concludes that the ESA authorizes the Speed Rule, there will be a serious risk that the statute is unconstitutional under the nondelegation doctrine. *See infra*. Because it is "fairly possible" to read the statute not to authorize the Speed Rule, and such reading

would avoid constitutional doubt, the Court should adopt that interpretation. *United States v. Hansen*, 599 U.S. 762, 781 (2023). Importantly, the principle applies even if the Court concludes that the statute is constitutional. "Courts should indeed construe statutes to avoid not only the *conclusion* that they are unconstitutional, but also *grave doubts* upon that score." *United States v. Palomar-Santiago*, 593 U.S. 321, 328–29 (2021) (quotation modified).

## II.    The Marine Mammal Protection Act Does Not Support the Speed Rule

In addition to the ESA, NOAA also invoked the MMPA, § 1382(a), to support the Speed Rule. The above arguments apply equally to § 1382(a), which permits regulations "necessary and appropriate to carry out the purposes of" the MMPA. The MMPA was enacted to protect marine mammals by prohibiting their "take" and activities downstream of take. § 1372. It allows, but does not require, individuals to seek authorization before undertaking activities that can result in take. § 1374. And Congress rejected NOAA's request to prohibit actions that simply have "the potential to injure" a protected animal. Marine Mammal Protection Act of 2004, *supra*. That limitation is part of the statutory purpose. *See Regions Bank*, 936 F.3d at 1196. Because the Speed Rule prohibits moving above 10 knots even when no take occurs, as in Mr. Eubank's case, the Rule extends the MMPA. Any ambiguities should be construed in Plaintiffs' favor under the rule of lenity, *see* § 1375(b) (criminal penalties), and constitutional avoidance.

The Speed Rule is *ultra vires* under the MMPA for an additional reason.

NOAA's invocation of the statute's general rulemaking authority, § 1382(a), to support the Rule, NMFS_004774, was erroneous because take-related regulations must be issued under § 1373, which grants the Secretary of Commerce limited authority to establish "[r]egulations on taking of marine mammals." And to issue rules under this authority, the Secretary must first consult five statutory factors. § 1373(a).

"General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932). Thus, for statutes "in which a general authorization and a more limited, specific authorization exist side-by-side," "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (simplified).

Because take-related rulemaking is "a matter specifically dealt with in" the more restrictive § 1373, § 1382(a) "will not be held to apply to" take-related regulations. *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228 (1957). To permit NOAA to make take-related rules under § 1382(a) would allow it to circumvent the limitations of § 1373 and negate Congress's intent to limit the power to regulate take.

Because of this, § 1382(a) does not authorize the Speed Rule, which is meant to prevent takes. Furthermore, § 1373 cannot now support the Speed Rule. NOAA invoked only § 1382(a) when it promulgated the Speed Rule, and "[a]n agency must defend its actions based on the reasons it gave when it acted." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 24 (2020). And NOAA never conducted the five-factor analysis required for rulemaking under § 1373.

### III.    The Speed Rule Decides a Major Question

As argued above, the Rule is *ultra vires* under an ordinary reading of the statutes. But more is needed: there must be a clear statement authorizing the Speed Rule.

Under the major questions doctrine, "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, . . . [courts] typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation modified). That skepticism requires "Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of HHS*, 594 U.S. 758, 764 (2021) (*per curiam*) (citation omitted).

NOAA claims the power to forbid activities that merely have the potential to injure a protected species, an expansive power that reaches routine maritime operations and recreational boating across millions of square miles of ocean, and even land-based activities. Indeed, NOAA has already attempted to expand the Speed Rule to nearly the whole East Coast and to vessels as small as 35 feet in length. 87 Fed. Reg. 46,921, 46,934 (Aug. 1, 2022). NOAA withdrew the proposal under pressure, but it continues to defend its claimed power, including in this case. NOAA's interpretation would allow it to regulate not just vessel speeds, but vessel sizes and routes, provided a regulation could, in exceedingly rare cases, prevent a take. NOAA could shut down critical ports, grind shipping and fishing to a halt, and severely disrupt international trade—so long as it would prevent one right whale mortality annually. The Court should ask NOAA: under your interpretation, what can't you do and why?

19

As it is, the Speed Rule imposes significant costs on East Coast boating and shipping. When the rule was issued, it was estimated to cost $116 million annually in 2006 dollars. NMFS_002863. NOAA's proposed expansion would have cost an additional $46 million annually. 87 Fed. Reg. at 46,934. As Justice Gorsuch observed regarding a vaccine mandate, "[f]ar less consequential agency rules have run afoul of the major questions doctrine." *NFIB v. OSHA*, 595 U.S. 109, 122–23 (2022) (Gorsuch, J., concurring) (citing *MCI Telecomms.*, 512 U.S. at 231 (concerning a rate requirement that might affect the prices of "40% of a major sector" of long-distance carriers)).

Under the major questions doctrine, such power requires clear congressional authorization, which is absent in the general provisions of § 1382(a) and § 1540(f).

NOAA's claimed power goes beyond oceanic speed limits. Its interpretation would permit it to resurrect greenhouse-gas rules struck down as *ultra vires* under *West Virginia v. EPA*, 597 U.S. 697 (2022). After all, NOAA has already concluded that "climate change is impacting every aspect of [right whales'] survival." NOAA, *NOAA, BOEM Announce Final North Atlantic Right Whale and Offshore Wind Strategy* (Jan. 25, 2024), https://www.noaa.gov/news-release/noaa-boem-announce-final-north-atlantic-right-whale-and-offshore-wind-strategy. As climate change may sometimes lead to a right whale death—and as even one death is a great loss—NOAA's reading would permit it to regulate land-based emissions many miles from a right whale.

But *West Virginia* held under the major questions doctrine that such expansive power must be clearly authorized. That power is the same as that which NOAA claims here. And just as Congress had not clearly authorized that power in the Clean Air Act,

20

so, too, with the MMPA or ESA. Rather, Congress has clearly refused NOAA's authority to regulate actions that merely have the potential to injure a protected animal. Marine Mammal Protection Act of 2004, *supra*.

## IV.    Alternatively, the MMPA or ESA Violates the Nondelegation Doctrine

If § 1382(a) or § 1540(f) supports the Speed Rule, it delegates lawmaking power in violation of the Constitution. Article I of the Constitution vests "[a]ll legislative Powers" in Congress. U.S. Const. art. I, § 1. Congress may permit agencies to "fill up the details" of a statutory scheme, *Wayman v. Southard*, 23 U.S. 1, 43 (1825), but it may not abdicate its own duty to decide what conduct is lawful in the first place. *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 418–19 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

NOAA's interpretation of the MMPA and ESA cannot be sustained under that standard. On its reading, the agency may prohibit any activity it deems risky to a protected species, without any statutory direction about whether and when such measures are appropriate, how stringent they may be, or what competing values must be accommodated. That interpretation leaves NOAA with discretion to regulate vessel speed, fishing practices, recreational boating, or even land-based activities, even when the likelihood of a take is remote. Such open-ended discretion is legislative in nature.

The Supreme Court recently clarified in *FCC v. Consumers' Research* that the nondelegation doctrine requires Congress to provide not only general policy guidance but also meaningful boundaries on agency discretion. 145 S. Ct. 2482, 2497 (2025). The case concerned the Universal Service program, which subsidizes specific telecom

services with a tax on telecom companies. The Court upheld the program only because it was limited by multiple, separately mandatory requirements: the FCC could subsidize services only for designated beneficiaries, and only if those services met enumerated criteria such as affordability, widespread use, and essentiality to education, health, or safety. *Id.* at 2502–03. It must raise no more *and* no less money than is necessary to fund that program. *Id.* at 2501–02. As "proof" that "the statutory boundaries [are] specific," the Court pointed out that the FCC's Universal Service programs "reflect[] Congress's choices about universal service's scope and content." *Id.* at 2504. "Congress made clear the parameters of the programs." *Id.* at 2505.

NOAA's interpretation of the ESA and MMPA lacks such boundaries. The Speed Rule, for example, does not "reflect[] Congress's choices"; nothing in the statutes show that Congress prohibited everyday actions with a minuscule probability of take. *Id.* at 2504. If the statutes permit the Speed Rule, Congress certainly has not "made clear the parameters" of what is allowed. *Id.* at 2505. As discussed, NOAA in 2022 proposed expanding the Speed Rule from vessels above 65 feet to those as short as 35 feet, and from small SMAs to the entire Eastern Seaboard. 87 Fed. Reg. 46,921. NOAA's interpretation, lacking boundaries, cannot tell us whether such a rule exceeds those boundaries. Why not vessels as small as 10 feet or limit speeds to 2 knots? Why not ground East Coast vessels completely? That would better protect the right whale.

Rather than acknowledge any boundary, NOAA's interpretation relies purely on the existence of a general policy: preventing take of protected animals, particularly ones in danger of extinction. Without clear statutory boundaries, the agency's

22

authority extends to any activity it deems risky to protected species, even where the probability of harm is remote. But *Consumers' Research* held that a policy, without boundaries, is insufficient. That must be the case, because "no legislation pursues its purpose at all costs." *Regions Bank*, 936 F.3d at 1195 (citation omitted). But under NOAA's interpretation of the ESA and MMPA, no cost is too high.

*Consumers' Research* was not the first nondelegation case to require limits. Other delegations have been upheld only when guided by similarly concrete standards. In *Yakus v. United States*, 321 U.S. 414, 420–21 (1944), Congress directed agencies to stabilize commodity prices at levels "generally fair and equitable," while also considering detailed factors about cost of production and distribution. In *Mistretta v. United States*, 488 U.S. 361 (1989), Congress gave the Sentencing Commission a comprehensive framework, including enumerated factors. And in *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472–76 (2001), the EPA's authority was bounded by the requirement to set ambient air quality standards "requisite to protect public health." Each case involved broad purposes, and they survived nondelegation challenges only because those purposes had been paired with specific and binding standards.

By contrast, when Congress has left agencies free to act without meaningful criteria, the statutes are unconstitutional. In *Panama Refining*, 293 U.S. at 418–19, Congress let the President ban petroleum shipments whenever he thought "circumstances" warranted, with no guiding standards. In *Schechter Poultry*, 295 U.S. at 538–42, Congress allowed the President to approve "codes of fair competition" subject only to vague limits like not promoting monopolies, which left a "wide field of

23

legislative possibilities" in which the Executive could "roam at will." The same is true here. Congress directed NOAA to protect "marine mammals" or "endangered species," but—assuming it authorized speed restrictions—supplied no criteria to guide, *e.g.*, when speed restrictions should apply, how stringent they should be, or how to balance risks against maritime commerce.

This lack of boundaries becomes clearer by comparison. In 2024 alone, there were more than 22,000 aircraft strikes against birds, with 90% of strikes involving federal protected migratory birds, some of which are ESA-listed. *See* FAA, *Wildlife Strikes to Civil Aircraft in the United States, 1990–2024*, at 1, 45 (June 2025), https://www.faa.gov/airports/airport_safety/wildlife/wildlife-strike-report-1990-2024; *see id.* at 87 (listing horned larks among the five most frequently struck species, with 9,197 strikes across 35 years); 87 Fed. Reg. 21,783 (Apr. 13, 2022) (listing a horned lark subspecies as threatened). Yet no one thinks agencies may use the ESA or Migratory Bird Treaty Act, §§ 703(a) (take prohibition), 712(2) (rulemaking authority), to prohibit flights during migratory seasons. Indeed, courts have rejected such overreach in other contexts, striking down a post–*Deepwater Horizon* moratorium on drilling in the Gulf of Mexico for lacking any limiting principle, *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627, 636–37 (E.D. La. 2010), and rejecting the EPA's attempt to treat virtually every wetland and ditch as a "water of the United States," *Sackett v. EPA*, 598 U.S. 651, 678–80 (2023). On NOAA's reading, however, agencies' rulemaking authority would extend that far.

The nondelegation problem here is particularly sharp because the Speed Rule

defines what conduct is punishable. The Supreme Court has indicated that delegations with criminal sanctions require heightened specificity. In *Touby v. United States*, 500 U.S. 160, 165–67 (1991), the Court upheld a temporary delegation of criminal lawmaking power to the Attorney General to add substances to the schedules of the Controlled Substances Act, but only because Congress required a specific factual finding—an "imminent hazard to the public safety"—and constrained that determination with enumerated statutory factors. No comparable limits restrain NOAA here, even though its Speed Rule is enforced by criminal penalties.

If the ESA or MMPA supports the Speed Rule, it does so without limit and is therefore unconstitutional under the nondelegation doctrine.

## CONCLUSION

For the reasons set forth above, the Speed Rule is void. Plaintiffs respectfully request that the Court grant their motion for summary judgment and set aside the unlawful agency action.

Dated: October 3, 2025.

Respectfully submitted,

OLIVER J. DUNFORD
Fla. Bar No. 1017791
*Local Counsel*
PACIFIC LEGAL FOUNDATION
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: 916.503.9060
ODunford@pacificlegal.org

/s/ Michael Poon
MICHAEL POON*
Cal. Bar No. 320156
*Lead Counsel*
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: 916.419.7111
MPoon@pacificlegal.org

*Attorneys for Plaintiffs*
*\*pro hac vice*

25

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2025, I served this document via the

Court's electronic filing system to the Defendants:

Adam R.F. Gustafson
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division

Mark Arthur Brown
Wildlife and Marine Resources Section
Environment & Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
mark.brown@usdoj.gov

*Counsel for Defendants*

/s/ Michael Poon
MICHAEL POON
Pacific Legal Foundation

26