# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**GERALD L. EUBANKS** and
**DETERMINATION III 130 WESTPORT, LLC**,

        Plaintiffs,

    v.

**HOWARD LUTNICK**, in his official capacity as
Secretary of the United States Department of
Commerce; and **NATIONAL OCEANIC AND**
**ATMOSPHERIC ADMINISTRATION**,

        Defendants.

No. 8:25-cv-00614-CEH-AAS

## PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    The Speed Rule Extends, Not Enforces, the Endangered Species Act .............1

II.   The Speed Rule Extends, Not Carries Out, the Marine Mammal
      Protection Act ..........................................................................................5

    A.    Section 1382(e) ...................................................................................6

    B.    Section 1373(a) .................................................................................10

III.  The Speed Rule Is an Invalid Categorical Regulation ...................................12

IV.   NOAA's Interpretation Claims Authority to Decide Major Questions..........15

V.    NOAA's Interpretation of the ESA and MMPA Violates the
      Nondelegation Doctrine ...............................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) ................................................................. 18–19

*Ala. Ass'n of Realtors v. Dep't of HHS*,
    594 U.S. 758 (2021) ...................................................................17

*American Power & Light Co. v. SEC*,
    329 U.S. 90 (1946) .....................................................................19

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*,
    466 F.3d 134 (D.C. Cir. 2006) .....................................................2

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
    433 U.S. 36 (1977) ................................................................ 13–14

*Ctr. for Biological Diversity v. NMFS*,
    No. 22–5295, 2024 WL 3083338 (D.C. Cir. June 21, 2024) .................3

*Dep't of Air Force v. FLRA*,
    877 F.2d 1036 (D.C. Cir. 1989) .................................................6–7

*FCC v. Am. Broad. Co.*,
    347 U.S. 284 (1954) .................................................................2–3

*FCC v. Consumers' Rsch.*,
    606 U.S. 656 (2025) ...................................................................19

*Hewitt v. Comm'r*,
    21 F.4th 1336 (11th Cir. 2021) .....................................................6

*Huff v. DeKalb Cnty.*,
    516 F.3d 1273 (11th Cir. 2008) ...................................................10

*La. Shrimp Ass'n v. Biden*,
    789 F.Supp.3d 467 (E.D. La. 2025) ...............................................3

*Lofstad v. Raimondo*,
    117 F.4th 493 (3d Cir. 2024) .......................................................12

*MCI Telecomms. Corp. v. AT&T*,
    512 U.S. 218 (1994) .....................................................................2

*Michigan v. EPA*,
    576 U.S. 743 (2015) .....................................................................3

*NFIB v. OSHA*,
   595 U.S. 109 (2022) .................................................................... 16

*Panama Refin. Co. v. Ryan*,
   293 U.S. 388 (1935) .................................................................... 19

*Ragsdale v. Wolverine World Wide, Inc.*,
   535 U.S. 81 (2002) ............................................................... *passim*

*Regions Bank v. Legal Outsource PA*,
   936 F.3d 1184 (11th Cir. 2019) ........................................ 2, 6, 10, 15

*Russo v. Raimondo*,
   _ F.Supp.3d _, 2025 WL 3280947 (S.D. Ala. Nov. 24, 2025) ............ 12

*Touby v. United States*,
   500 U.S. 160 (1991) .................................................................... 20

*United States v. Mitchell*,
   39 F.3d 465 (4th Cir. 1994) ............................................................ 3

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) .................................................................... 18

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ......................................................... 15–16, 18

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ...................................................................... 9

*Yates v. United States*,
   574 U.S. 528 (2015) ................................................................... 4, 9

## Statutes

5 U.S.C. § 7132(c) ............................................................................ 7

16 U.S.C. § 1362(2) ........................................................................... 9

   § 1362(13) ................................................................................... 3

   § 1362(18) ................................................................................... 3

   § 1362(18) ................................................................................... 6

   § 1362(18)(A) ............................................................................ 14

   § 1371(a) ..................................................................................... 9

   § 1371(a)(3)(A) ...................................................................... 10–11

   § 1373 ................................................................................... 10–11

§ 1373(a) ..................................................................................... 10, 12

§ 1373(d) .................................................................................... 10, 12

§ 1375(b) .........................................................................................15

§ 1382(a) ..........................................................................6, 10, 17, 19

§ 1382(e) ................................................................................ *passim*

§ 1532(3) ...........................................................................................4

§ 1533(d) ........................................................................................4–5

§ 1538(a) ...........................................................................................5

§ 1538(a)(1)(A) ..................................................................................4

§ 1538(b) ...........................................................................................5

§ 1538(b)(2)(B) ..................................................................................5

§ 1539(a) ...........................................................................................5

§ 1539(a)(2)(A) ..................................................................................1

§ 1539(e)(1) .......................................................................................5

§ 1539(e)(4) .......................................................................................5

§ 1540(a)(1) .....................................................................................4–5

§ 1540(b)(1) .....................................................................................15

§ 1540(f) ...........................................................................3–4, 17, 19

§ 1852(a) .........................................................................................11

§ 1853 .............................................................................................11

§ 1854(a) ......................................................................................11–12

§ 1854(a)(1)(A) ...............................................................................11

§ 1854(a)(3) .....................................................................................11

## Regulations

50 C.F.R. § 222.301(d)(1) .................................................................5

§ 222.301(f) ......................................................................................5

§ 222.301(g) .....................................................................................5

§ 222.301(i) ......................................................................................5

§ 222.301(j) ...................................................................................................5

56 Fed. Reg. 42,541 (Aug. 28, 1991) ......................................................11

60 Fed. Reg. 39,271 (Aug. 2, 1995) ........................................................12

65 Fed. Reg. 34,590 (May 31, 2000) .......................................................11

86 Fed. Reg. 53,818 (Sep. 28, 2021) .......................................................10

87 Fed. Reg. 42,104 (July 22, 2022) ........................................................11

## Other Authorities

Response Brief of Defendants-Appellees, *Wille v. Raimondo*,
   No. 24-1734, 2024 WL 5237872 (4th Cir. Dec. 19, 2024) ...................................8

U.S. Department of Commerce, Transmittal No. 61 (Feb. 24, 2015),
   https://www.noaa.gov/sites/default/files/legacy/document/2020/
   Mar/transmittal-61.pdf...................................................................7–8

NOAA seeks to hold Mr. Eubanks liable even though he undisputedly did not take or even encounter a right whale. For NOAA to succeed, the agency must persuade the Court to expand the Endangered Species Act ("ESA") or Marine Mammal Protection Act ("MMPA") beyond the limits Congress set. To support that expansion, NOAA attempts to recast Congress's carefully calibrated frameworks—focused on punishing actual take and specified downstream activities—as open-ended mandates authorizing any measure the agency deems protective. But Congress chose how to assist protected species, and NOAA may not rewrite those choices by layering on new prohibitions, especially prohibitions of acts that only very rarely result in take. NOAA's interpretation would fundamentally alter the statutes and the agency's regulatory power. The Court should reject NOAA's effort to manufacture liability where Congress provided none.

## I.    The Speed Rule Extends, Not Enforces, the ESA

In the ESA, Congress chose to assist protected species by prohibiting take and downstream actions, while encouraging those who undertake activities that could result in take to obtain an incidental-take permit, which requires undertaking a conservation plan. 16 U.S.C. § 1539(a)(2)(A). Some members of the public and of Congress surely wanted stronger protections, but the ESA enacted Congress's compromise, and "[c]ourts and agencies must respect and give effect to these sorts of compromises." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 94 (2002). The Speed Rule does the opposite. It adds restrictions not included in the ESA and inverts Congress's compromise that allows for activities that could—but do not—result in

take. The rule thus does not enforce the ESA but creates its own prohibition.

NOAA tries to align the Speed Rule with the ESA by framing the rule as "protecting against" take. ECF No. 48 at 10 ("XMSJ"). NOAA's framing, along with its repeated appeals to statutory purpose, *see, e.g.*, *id.* at 11, assumes that the ESA allows the agency to prohibit anything that could result in take. But "no legislation pursues its purpose at all costs." *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1195 (11th Cir. 2019) (citation omitted). Instead, courts and agencies must respect the "particular way" that Congress chose to protect against take. *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 140 (D.C. Cir. 2006); *accord FCC v. Am. Broad. Co.*, 347 U.S. 284, 290, 298 (1954). Here, the statute protects against take by penalizing take and downstream activities, and these "operative provisions" are "a reflection of the genuine 'purpose' of the statute." *Regions Bank*, 936 F.3d at 1195 (cleaned up). By framing the rule as protecting against the same harm as the statute, NOAA elides the Speed Rule's effect: to add to the ESA's operative provisions, rather than to enforce them. Here, Mr. Eubanks undisputedly did not take or even encounter a right whale; so punishing Mr. Eubanks cannot enforce the ESA's take prohibition.

NOAA buries its response to *Colorado River* and *American Broadcasting* in a footnote that refuses to confront their central holdings. XMSJ at 14 n.9. First, *Colorado River* held that even "general rulemaking authority" is "bound . . . by the means [Congress] has deemed appropriate and prescribed, for the pursuit of [a statute's] purposes," 466 F.3d at 139 (quoting *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994)), but NOAA nakedly asserts in response that "Congress did not limit [the

2

agency's] regulatory authority" under the ESA, XMSJ at 14 n.9.

NOAA likewise fails to respond to the heart of *American Broadcasting*, 347 U.S. at 290, which held that, where activities are not illegal under a statute, an agency "cannot employ the statute to make them so by agency action." In response, NOAA again claims that "the Speed Rule protects against the same activity" as the statute, *i.e.*, take, XMSJ at 14 n.9—when what matters is that the rule bars a *different* activity than the statute.[1]

NOAA claims authority to issue prophylactic regulations under § 1540(f) by relying on three nonbinding and inapposite cases. XMSJ at 10. Two cases concerned a prophylactic ESA regulation requiring fishermen to attach turtle-exclusion devices to their nets to avoid catching sea turtles. But the scope of NOAA's statutory authority was not at issue or discussed in either case. *Ctr. for Biological Diversity v. NMFS*, No. 22–5295, 2024 WL 3083338, at *1–*4 (D.C. Cir. June 21, 2024); *La. Shrimp Ass'n v. Biden*, 789 F.Supp.3d 467, 479–88 (E.D. La. 2025). The third case upheld under § 1540(f) a regulation requiring importers of game trophies to complete paperwork to determine whether they had violated the ESA's ban on importing a protected species. *United States v. Mitchell*, 39 F.3d 465, 471 (4th Cir. 1994). *Mitchell* is consistent with Plaintiffs'

---

[1] Amici Conservation Groups argue that the ESA's authority for "necessary and appropriate" regulations extends to the Speed Rule, ECF No. 58 at 9, 11–12, but amici identify no limit to that power and, like NOAA, amici have no response to *Colorado River* or *American Broadcasting*, both of which concerned general rulemaking provisions with similar "necessary and appropriate" language. As the Supreme Court has held, the "capaciousness of th[e] phrase," while "leav[ing] agencies with flexibility," *limits* agency power by, *e.g.*, requiring the agency to "consider[] . . . all the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted). NOAA has a flexible power to fill up details—for example, by identifying what constitutes harassment of a marine mammal, *see* § 1362(13), (18)—not to add substantive restrictions.

position: The regulation there plainly enforces the ESA by helping the government investigate whether a statutory violation has *already* occurred, *see* § 1538(a)(1)(A), rather than prohibiting actions not covered by the statute that *might later* cause a statutory violation. These cases shed no light on the issues here.

Next, NOAA argues that statutory harmony requires reading § 1540(f) to authorize the Speed Rule for the endangered right whale because § 1533(d) would authorize such a rule for threatened species. XMSJ at 12. But § 1533(d) would not authorize the Speed Rule for threatened species. To suggest otherwise, NOAA adopts an expansive interpretation of "conservation" in the first sentence of § 1533(d) that would allow the agency to ban essentially any private action that could harm a threatened species. But that renders superfluous the second sentence of § 1533(d), which identifies the private actions the agency may ban, to wit, the take of threatened species and actions downstream of take. Therefore, the first sentence is best read—based on illustrative examples of "conservation" in § 1532(3)—as affirmative steps that the government may carry out to recover a species. *See Yates v. United States*, 574 U.S. 528, 536–38, 543–44 (2015). This makes sense, because the specificity of the second sentence shows that Congress listed there *all* the private actions that NOAA may prohibit under § 1533(d). NOAA's reading—allowing it to regulate a vast, unspecified realm of private action—turns § 1533(d) on its head.[2]

NOAA also wrongly suggests that an ESA penalty provision, § 1540(a)(1),

---

[2] In the alternative, § 1533(d) is ambiguous, and the ambiguity is resolved in Plaintiffs' favor under the rules of lenity and constitutional avoidance.

contemplates something like the Speed Rule. XMSJ at 13. That provision contemplates that NOAA may adopt (1) regulations "issued in order to implement" the take prohibition and other specific prohibitions and (2) "other regulation[s]." Examples of "other regulations" pertaining to endangered species are varied, but none allows NOAA to adopt the Speed Rule. For example, some "other regulations" include: (1) obligations on holders of incidental-take permits for endangered species, § 1539(a); *see, e.g.*, 50 C.F.R. § 222.301(d)(1), (f)–(g), (i)–(j); (2) prohibitions on the take of endangered species by certain Native Americans, § 1539(e)(4);[3] and (3) paperwork requirements regarding endangered raptors held in captivity, § 1538(b)(2)(B). "Other regulations" also include a "regulation relating to recordkeeping or filing of reports" with respect to imports of fish and wildlife, § 1540(a)(1), and regulations issued under § 1533(d). Shunning the straightforward interpretation of "other regulations," NOAA instead extravagantly reads "other regulations" to trump the ESA's limits.

NOAA repeatedly ignores the question of *how* Congress intended to prevent take. It must, because its argument is that it may prevent take *however* it sees fit. No precedent supports such unlimited executive power, as underscored by the dearth of case citations in NOAA's argument. *See* XMSJ at 9–14. NOAA's remaining tactics—evasive framing and avoiding the central holdings of on-point cases—do not persuade.

## II.    The Speed Rule Extends, Not Carries Out, the MMPA

Plaintiffs' arguments with respect to the ESA apply also to the MMPA.

---

[3] These regulations do not implement the take prohibition of § 1538(a)–(b) because Native Americans are exempt from those prohibitions. § 1539(e)(1).

Principally, NOAA's MMPA arguments fail to confront *how* Congress intended to accomplish a moratorium on the taking of protected animals. XMSJ at 15–16. As with the ESA, Congress in the MMPA chose to effect a moratorium on take by punishing take and downstream activities. In defining "take" to include harassment, Congress *did* prohibit actions that "ha[ve] the potential to injure a marine mammal," but it expressly limited that prohibition to "act[s] of pursuit, torment, or annoyance." § 1362(18). When Congress refused NOAA's request to remove that limitation in 2003, NOAA adopted the Speed Rule, thus overruling the statutory limitation. And while NOAA now claims the Speed Rule advances the MMPA's purposes, "limiting provisions" are "a reflection of the genuine 'purpose' of the statute" and must be enforced. *Regions Bank*, 936 F.3d at 1195 (citation omitted).

Below, Plaintiffs address NOAA's two arguments specific to the MMPA.

## A.    Section 1382(e)

First, NOAA argues that the Speed Rule carries out § 1382(e), which authorizes the agency to "implement conservation and management measures." XMSJ at 16. But the Speed Rule itself does not invoke this authority for agency action; the rule was issued under § 1382(a), not (e). NMFS_004774. In fact, Plaintiffs could not locate any document in the administrative record citing § 1382(e). Because agency action must be justified on the grounds invoked at the time the action was taken, litigating counsel's attempt to ground the Speed Rule in § 1382(e) is a forbidden "post hoc rationalization[]." *Hewitt v. Comm'r*, 21 F.4th 1336, 1342 (11th Cir. 2021) (cleaned up); *Dep't of Air Force v. FLRA*, 877 F.2d 1036, 1041 (D.C. Cir. 1989) (refusing to consider

whether 5 U.S.C. § 7132(c) authorized a regulation because the agency "never invoked section 7132(c) as a basis of its regulation" until litigation arose).

NOAA also did not satisfy § 1382(e)'s procedural requirements—which both renders unlawful any reliance on § 1382(e) and further demonstrates that the agency did not rely on § 1382(e) in the first place. For example, to use his authority under § 1382(e), the Secretary must make a specific determination regarding impacts on areas of ecological significance "based on a stock assessment . . . or other significant new information obtained under this chapter." As NOAA notes, the Secretary delegated his MMPA duties to the head of the National Marine Fisheries Service, the Assistant Administrator for Fisheries. XMSJ at 3 n.3; U.S. Department of Commerce, Transmittal No. 61, at PDF 2–3 (Feb. 24, 2015) (Part II.C.23 delegating the Secretary's MMPA powers to the Assistant Administrator).[4] Here, the Acting Assistant Administrator approved the Speed Rule's restrictions in a decision memorandum, NMFS_003630, which lists the many statutory determinations that he made in approving the rule, NMFS_003633 ("DETERMINATIONS"). And though there is an MMPA determination, NMFS_003634, the § 1382(e) determination is absent.

To suggest that § 1382(e) was invoked and the necessary determination made, NOAA fishes out a single sentence from the preamble of the Speed Rule's Federal Register entry. XMSJ at 15–16; NMFS_004766 (observing that the number of ship strikes may be related to an overlap between shipping corridors and certain areas with

---

[4] https://www.noaa.gov/sites/default/files/legacy/document/2020/Mar/transmittal-61.pdf.

right whale activity). But this observation is not a § 1382(e) determination, and NOAA did not think it was when it issued the rule. The Assistant Administrator's statutory determinations were made in his decision memo, not in the Federal Register entry, which he did not sign. The Federal Register entry was signed by the Deputy Assistant Administrator; and, as NOAA has insisted elsewhere, that official holds no power under the MMPA. Response Brief, *Wille v. Raimondo*, No. 24-1734, 2024 WL 5237872, at *6 (4th Cir. Dec. 19, 2024) ("This delegation does not grant the DAARP rulemaking powers or any other substantive authority, but rather only the authority to take the ministerial action of signing a rule for publication following its approval by more senior officials."); *see* Transmittal No. 61, *supra*, at PDF 5. Therefore, the sentence in the Federal Register is not, and could not be, a § 1382(e) determination.

Furthermore, the sentence as written did not base its conclusion on the specific sources of information required by § 1382(e), and the sentence—tucked in the middle of a paragraph about the general increase in right whale deaths—is not how agencies make statutorily required findings. Finally, to invoke § 1382(e), NOAA must have "consult[ed] with the Marine Mammal Commission and the appropriate Federal agencies," but the decision memo and Speed Rule do not point to any such consultation. NOAA did not rely on § 1382(e) in issuing the rule, and so litigating counsel may not do so now.[5]

---

[5] This discussion, and all of Plaintiffs' arguments, applies to the 2013 rule and NOAA's quotation therefrom. XMSJ at 17. But it is the 2008 Speed Rule, not the 2013 removal of a sunset clause, that is at issue.

Finally, even if the Speed Rule had invoked § 1382(e), that provision does not authorize a speed limit. NOAA points to the definition of "'conservation' and 'management,'" § 1362(2), to argue that it may impose speed limits to prevent vessel strikes. But that definition, like the ESA definition of "conservation," *see supra*, is best read based on its illustrative examples as referring to affirmative actions that the *government* may pursue, not restrictions on *private* action. *See Yates*, 574 U.S. at 536–38, 543–44. The definition's reference to "periodic or total protection," § 1362(2), refers to NOAA's revoking allowances for take created under § 1371(a). Revoking those allowances totally protects a species by prohibiting *all* take of the species—and does so consistent with Congress's chosen means of preventing take by prohibiting and punishing take itself. NOAA's interpretation of § 1362(2) not only contradicts Congress's chosen means of preventing take, but it also improperly "hide[s] elephants in mouseholes" by reading into a vague sentence at the end of a technical definition the extraordinary authority to ban *any* action that merely has the potential to harm a marine mammal. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). This reading runs afoul of the major questions doctrine, as explained below. It also contradicts NOAA's own testimony before Congress in 2003—after § 1382(e)'s inclusion in the MMPA, XMSJ at 18—that a statutory amendment was needed to address vessel strikes because driving a vessel has the mere potential to strike a

protected animal.[6] Finally, again, the rule of lenity and constitutional avoidance cut in favor of reading "periodic or total protection" more narrowly than NOAA does.[7]

**B.    Section 1373(a)**

As Plaintiffs argued, ECF No. 41 at 18 ("MSJ"), § 1382(a) cannot support the Speed Rule because the rule is a "regulation[] with respect to the taking" of marine mammals and so must be made under § 1373. That distinction matters because Congress created § 1373 as the specific pathway for regulations concerning takes, complete with procedural safeguards that NOAA bypassed here. The agency responds that § 1373 applies only to "regulations that authorize take," XMSJ at 18, reading in a limitation to the provision that Congress did not impose. NOAA offers two arguments for its position: (1) § 1371(a)(3)(A) authorizes NOAA to allow take under § 1373 and (2) before making regulations under § 1373, NOAA must hold "an agency hearing on both the Secretary's determination to waive the moratorium . . . and on such regulations," that is, on the § 1373 regulation itself, § 1373(d). XMSJ at 19.

Neither point persuades. To start, NOAA's argument flies in the face of its own statements and past practice. It has repeatedly invoked 16 U.S.C. § 1373 (§ 103 of the MMPA) to restrict private action rather than authorize take. 86 Fed. Reg. 53,818,

---

[6] NOAA cites one sentence spoken by a single legislator to argue that § 1382(e) authorizes the Speed Rule. XMSJ at 18. But courts generally do not consider a single legislator's statement in statutory interpretation. *Huff v. DeKalb Cnty.*, 516 F.3d 1273, 1280 (11th Cir. 2008).

[7] NOAA argues that constitutional avoidance is inapplicable because the Supreme Court has "only twice previously" found nondelegation violations. XMSJ at 24. But courts find constitutional doubt by analyzing the law, not counting noses. And as explained below, the breadth of authority NOAA claims raises grave nondelegation concerns. Thus, Plaintiffs' narrower readings of the ESA and MMPA should be adopted. *Regions Bank*, 936 F.3d at 1193.

53,825 (Sep. 28, 2021) (arguing, in a rule forbidding approaching and swimming with dolphins, that "sections 102(a) and 103 of the MMPA" permit NOAA to "enforce regulations prohibiting take of marine mammals"); 87 Fed. Reg. 42,104, 42,104 (July 22, 2022) (NOAA Administrator ratifying the immediately preceding rule and stating that "sections 103 and 112 of the MMPA" provide him with authority to promulgate it); 65 Fed. Reg. 34,590, 34,592 (May 31, 2000) (conditioning restrictions on subsistence harvests on "a formal rulemaking hearing . . . held in accordance with section 103(d) of the MMPA"); 56 Fed. Reg. 42,541, 42,542 (Aug. 28, 1991) ("[T]he Secretary may issue regulations governing (including prohibiting) such taking after . . . complying with the requirements of section 103 of the" MMPA.).

As to NOAA's reference to § 1371(a)(3)(A), that provision only means that § 1373 may be used to allow take, not that it may *only* be used to allow take.

And as to the hearing on the Secretary's determination to waive the moratorium, the Court should follow the reasoning of courts that have analyzed a similarly structured provision: § 1854(a) from the Magnuson-Stevens Act, the primary statute regulating federal fisheries. That provision contemplates a regulatory process whereby the relevant fishery council, *cf.* § 1852(a), will adopt a fishery management plan, *cf.* § 1853, which the Secretary of Commerce (in practice, NOAA) will review for consistency with law, § 1854(a)(1)(A). He then approves or disapproves the plan, with a disapproval specifying "the applicable law with which the plan . . . is inconsistent," "the nature of such inconsistencies," and recommendations for the Council to fix those inconsistencies. § 1854(a)(3). Following NOAA's reasoning here, the Secretary may

disapprove a plan only if the plan is unlawful. But two federal courts have held that the Secretary may disapprove a plan even if the plan is consistent with law, because—despite the surrounding text regarding consistency with law—§ 1854(a) does not explicitly condition disapproval on inconsistency with law. *Lofstad v. Raimondo*, 117 F.4th 493, 500 (3d Cir. 2024); *Russo v. Raimondo*, _ F.Supp.3d _, 2025 WL 3280947, at *4 (S.D. Ala. Nov. 24, 2025), *appeal filed* (Jan. 20, 2026).

Applying the courts' reasoning here, § 1373(a) by its own terms applies to all "regulations with respect to the taking and importing of . . . marine mammal[s] . . . to insure such taking will not be to the disadvantage of those species . . . ." Section 1373(d) requires a hearing on a waiver on the moratorium only if the Secretary pursues such a waiver; just as § 1854(a) requires the Secretary to describe the illegality of a plan only if there is such illegality. Thus, the hearing requirement does not limit the scope of § 1373(a). NOAA itself has said as much. *See* 60 Fed. Reg. 39,271, 39,272 (Aug. 2, 1995) ("Section 103(d) requires that regulations be made on the record after opportunity for an agency hearing on such regulations and on *any* determination by the [Assistant Administrator] to waive the moratorium[.]" (emphasis added)). At minimum, the ambiguity should be resolved in Plaintiffs' favor under the rule of lenity.

## III. The Speed Rule Is an Invalid Categorical Regulation

*Ragsdale* imposed a clear limit on categorical rules, that is, rules creating *per se* illegality. 535 U.S. at 93. When a categorical rule's generalization fails to hold in the run of cases, it is invalid. Or put another way, a prohibited action must "usually present a pronounced risk" of the harm prohibited by the statute. *Id.* at 93. If, however, the

12

prohibited action is harmless in the run of cases, the rule "cannot be within the Secretary's power to issue regulations 'necessary to carry out'" the statute. *Id.* at 96. The record is clear—and NOAA does not dispute—that it is exceedingly rare for a vessel moving above 10 knots to strike a right whale. To defend against *Ragsdale*'s clear holding, NOAA suggests the standard is different.

First, NOAA objects that *Ragsdale* is limited to "categorical penalt[ies]." XMSJ at 20. While *Ragsdale* sometimes framed the categorical rule at issue there as a categorical penalty, *Ragsdale*'s holding clearly embraced all categorical rules:

> [C]ategorical rules—such as the rule *per se* antitrust illegality—reflect broad generalizations holding true in so many cases that inquiry into whether they apply to the case at hand would be needless and wasteful. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50, n.16 (1977). . . . When the generalizations fail to hold in the run of cases—when, for example, a particular restraint of trade does not usually present a pronounced risk of injury to competition—the justification for the categorical rule disappears.

*Id.* at 92–93 (citations omitted). Indeed, the rule discussed in *Continental* was not a categorical penalty but rather a rule of categorical illegality like the Speed Rule.

Second, NOAA notes that *Ragsdale* pointed out the inconsistency between the *Ragsdale* rule's remedial outcome and the statutory remedy. XMSJ 21. *Ragsdale* was not a remedies decision; it was an administrative law decision regarding the scope of agency rulemaking power. The analysis focused on whether the rule's generalization held in the run of cases. Because that generalization did not hold, the rule extended, and so was inconsistent with, "the [statute's] most fundamental substantive guarantee" by giving unnotified employees additional leave. 535 U.S. at 93. Here, because the Speed Rule's generalization does not hold in the run of cases, it unlawfully adds to the

statutes' prohibition against take and, with respect to the MMPA's prohibition of acts that "ha[ve] the potential to injure a marine mammal," erases Congress's decision to limit that prohibition to acts of pursuit, torment, or annoyance. § 1362(18)(A).

Third, NOAA argues that the Speed Rule satisfies *Ragsdale* because the rule has a "substantial relation" to take and regulates activities that "collectively" present a "pronounced risk" of take. XMSJ at 21. This is not the test. Rather, *Ragsdale* indicates that courts must analyze the probability of take created by single instances of moving above 10 knots. For example, the banned activity must "usually"—not collectively— present a pronounced risk of, here, take. 535 U.S. at 93. Furthermore, the generalization that the prohibited activity results in take must hold "in the run of cases," a much higher bar than NOAA's "substantial relation" test. *Id.* As the Court explained in *Continental*, exceptions to the generalization must not be "sufficiently common or important." 433 U.S. at 50 n.16. These requirements are clearly not satisfied here: NOAA does not dispute that moving above 10 knots almost never results in take, with less than one vessel-strike mortality or serious injury for one million miles transited in violation of the Speed Rule. MSJ 12–14.

NOAA's standard conflicts with *Ragsdale*'s outcome. The *Ragsdale* regulation required employers to notify employees when leave would count toward the FMLA entitlement; and, in the absence of notice, the leave would not count toward the entitlement, which would remain available. 535 U.S. at 88. The rule was invalid because the rule's generalization—that an unnotified employee "would not have taken any leave at all if . . . notice had been given"—holds true in only in the "most

14

exceptional of cases." *Id.* at 93. But under NOAA's analysis, it suffices that, analyzing leave-taking employees "collectively," there will be some cases where an unnotified employee would not have taken any leave if he had been notified. XMSJ at 21.

Finally, NOAA finds it "strange" that, if the right whale population declines, a right-whale categorical rule will be less justified under *Ragsdale*. But that scenario is not present here. Vessel strikes have always been exceedingly rare, and the Speed Rule was an unlawful categorical rule from its promulgation. More to the point, NOAA's hypothetical outcome would be strange only if Congress sought to prevent take "at all costs." *Regions Bank*, 936 F.3d at 1195 (citation omitted). But Congress chose to prevent take by prohibiting take and downstream actions, and it is intuitive, not strange, that an agency may not criminalize actions that are harmless in the run of cases. Much stranger is NOAA's theory, under which Congress allowed for someone to be thrown in jail for a year, §§ 1375(b), 1540(b)(1), for an action that had a one-in-a-million chance of causing take—and that, in fact, *did not* cause take.

## IV.    NOAA's Interpretation Claims Authority to Decide Major Questions

The Speed Rule independently fails under the major questions doctrine. The Supreme Court has made clear that when an agency asserts authority to regulate a matter of vast economic and political significance, it must point to clear congressional authorization. *West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022). Critically, the doctrine focuses on the scope of authority the agency claims to justify its action, not merely the effects of the particular regulation adopted. *See id.* at 721 (concerning "the authority that the agency has asserted" and agencies' "claimed authority" (cleaned

15

up)). For example, *West Virginia* relied on *NFIB v. OSHA*, 595 U.S. 109 (2022), which held unlawful an OSHA regulation requiring most U.S. employees to be vaccinated for COVID-19. The case discussed the regulation's significant costs, but it primarily focused on the breadth of OSHA's claimed authority: the power "to regulate the hazards of daily life" beyond the vaccination requirement, such as "crime, air pollution, or any number of communicable diseases." *Id.* at 118. Accepting OSHA's interpretation would have "significantly expand[ed] [its] regulatory authority." *Id.*

Plaintiffs pointed out that NOAA's interpretation of the ESA and MMPA would likewise work an extraordinary expansion of its regulatory authority, including issues beyond the Speed Rule. MSJ at 19–20. From vehicle emissions to power plant operations, to methane-producing agriculture, and more, anything with the potential to cause a take of a protected animal would be within NOAA's regulatory authority. That is the reading of the statute that NOAA asks this Court to validate; and it is that kind of regulatory expansion that the major questions doctrine addresses.

Plaintiffs posed the question: "Under your interpretation, what can't you do and why?" *Id.* at 19. NOAA offers no response. It does not, for example, deny Plaintiffs' assertion that its interpretation would empower the agency to resurrect the trillion-dollar Clean Power Plan. *See id.* at 20. It certainly does not analyze the breadth of its claimed authority as Supreme Court precedent demands. Instead, NOAA shrinks its analysis to the Speed Rule, pointing out that the Speed Rule's economic impacts— estimated at $46 million annually, XMSJ at 30—are below the ten-figure costs in cases like *West Virginia*. *Id.* To be sure, the economic effects of a particular agency action

16

may explain the breadth of the authority asserted. For example, a trillion-dollar agency action necessarily entails a claim of broad authority. But the reverse is not true, and the focus remains the claim of authority, not the agency action.

Furthermore, the major questions doctrine does not require a particular monetary threshold, and the Speed Rule is itself intrusive. *See Ala. Ass'n of Realtors v. Dep't of HHS*, 594 U.S. 758, 765 (2021) (applying doctrine to eviction moratorium by focusing on its "sweeping" intrusion into landlord-tenant relations and billions in unrecouped rents). The Speed Rule mandates operational restrictions on virtually all large vessels across the East Coast for months each year, disrupting commercial shipping, recreational boating, port operations, and interstate commerce. NOAA's own assessment confirms the Rule's breadth: it applies coastwide to high-traffic areas near ports like New York/New Jersey and Savannah, affecting thousands of vessels and imposing compliance burdens that ripple through supply chains. NOAA_001609. This is no "modest" measure, XMSJ at 30. It fundamentally alters maritime practices in the Atlantic Ocean, a sector vital to the national economy, thus triggering the doctrine even if costs fall short of trillion-dollar benchmarks.

NOAA also argues that §§ 1540(f) and 1382(a) have been invoked "for decades" to impose speed-related measures, XMSJ at 29, but that history does not supply clear authorization for the power claimed here. Most of those restrictions were limited to contexts in which protected species were present, not a categorical regulation that applies regardless of whether a right whale is nearby or hundreds of miles away—and which NOAA does not dispute can be made far more restrictive. Past exercises of

modest authority cannot be aggregated into permission for a fundamentally different regulatory program. *See West Virginia*, 597 U.S. at 724–29 (rejecting reliance on EPA's regulatory history to justify a "transformative expansion" of authority).

NOAA's late reliance on § 1382(e) only underscores the major questions problem. XMSJ at 16–17. Plaintiffs could not identify any instance in which § 1382(e) has been used to prohibit private conduct, much less to regulate conduct with such an attenuated connection to an actual or imminent take. And § 1382(e) is not the MMPA's general rulemaking provision, but a conditional, specific authority triggered only by particular findings and specific procedural steps. This "long-extant" statute is thus precisely the sort of ancillary provision that the Supreme Court has warned agencies may not use to justify a "transformative expansion" of regulatory power. *West Virginia*, 597 U.S. 697 at 723–24; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). If Congress had intended to authorize a vessel-speed regime governing all large vessels along the Atlantic seaboard, it would not have hidden that authority in a secondary subsection that NOAA itself did not invoke when issuing the rule. Section 1382(e) cannot supply the requisite clear congressional authorization.

## V.    NOAA's Interpretation Violates the Nondelegation Doctrine

If the ESA or MMPA were construed as NOAA suggests, it would delegate legislative power in violation of Article I, rendering the Speed Rule unlawful. The Constitution vests all legislative power in Congress, and while Congress may allow agencies to fill in details, it may not transfer to them the authority to decide what conduct is lawful in the first instance. *A.L.A. Schechter Poultry Corp. v. United States*, 295

U.S. 495, 529 (1935).

Recent precedent clarifies that delegations must provide an "intelligible principle" with concrete constraints, not just aspirational goals. *See FCC v. Consumers' Rsch.*, 606 U.S. 656, 684–86 (2025) (upholding delegation only because Congress specified multiple statutory factors that, taken together, limited the range of agency choices). NOAA argues the ESA's and MMPA's conservation directives supply such a principle, XMSJ at 25–26, but these are classic open-ended mandates disallowed by the nondelegation doctrine. If it were otherwise, NOAA could regulate any activity posing "risk" to species, without thresholds to determine when intervention is required, how to balance competing interests (*e.g.*, commerce vs. conservation), or the limits on regulatory scope. Under this view, the same logic justifying a 10-knot limit for 65-foot vessels could extend to 5-knot limits, 35-foot vessels, or outright navigation bans—leaving NOAA to "roam at will" in a "wide field of legislative possibilities." *Schechter Poultry*, 295 U.S. at 538; *cf. Panama Refin. Co. v. Ryan*, 293 U.S. 388, 418–19 (1935) (invalidating delegation lacking criteria for when to prohibit shipments).

NOAA cites post-New Deal cases like *American Power & Light Co. v. SEC*, 329 U.S. 90 (1946), XMSJ at 25–26, but those cases involved statutes that meaningfully constrained agency discretion through enumerated factors and procedural guardrails. In *American Power*, Congress directed the SEC to ensure corporate structures were not "unduly complicated" and geographically integrated, providing specific metrics for agency action. 329 U.S. at 104–05. By contrast, as NOAA interprets them, the ESA's § 1540(f) and MMPA's § 1382(a) contain no comparable limits—no requirement of

19

imminent harm, no specific factors to consider, and no temporal or geographic constraints. Under that interpretation, NOAA could regulate based on any "risk," no matter how attenuated, effectively redefining civil and criminal liability without congressional boundaries. *See Touby v. United States*, 500 U.S. 160, 166 (1991) (upholding temporary drug-scheduling delegation only due to "imminent hazard" threshold, enumerated factors, and time limits—safeguards missing here).

\*     \*     \*

The applicable principles are clear: Statutes do not pursue their purposes at all costs. Instead, Congress chooses specific means for accomplishing its purpose, and that choice limits agency authority. Ultimately, the congressional compromise, as borne out by a statute's operative and limiting provisions, must be given effect. NOAA's arguments do not respect these fundamental boundaries on its authority. Indeed, the agency issued the Speed Rule having testified to Congress—and so knowing full well—that it lacked authority to do so. The rule's illegality is thus NOAA's own fault, and the Court should not allow NOAA to compound its unlawful behavior by punishing Mr. Eubanks, who never even encountered a right whale. Instead, the Court should recognize the Speed Rule as unlawful and vacate the citation and civil penalty imposed by NOAA.

DATED: January 28, 2026.

Respectfully submitted,

/s/ Oliver J. Dunford
OLIVER J. DUNFORD
Fla. Bar No. 1017791

*Local Counsel*
PACIFIC LEGAL FOUNDATION
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: 916.503.9060
ODunford@pacificlegal.org

/s/ Michael Poon
MICHAEL POON*
Cal. Bar No. 320156
*Lead Counsel*
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: 916.419.7111
MPoon@pacificlegal.org

*Attorneys for Plaintiffs*
*\*pro hac vice*

21

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2026, I served this document via the Court's

electronic filing system to the Defendants:

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney
   General Environment & Natural
   Resources Division

MARK ARTHUR BROWN
Wildlife and Marine Resources Section
Environment & Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
mark.brown@usdoj.gov

*Counsel for Defendants*

DANICA ANDERSON GLASER*
Senior Counsel
Oceana
1025 Connecticut Ave. NW, Suite 200
Washington, DC 20036
dglaser@oceana.org

*Counsel for Amicus Oceana*

*admitted *pro hac vice*

JANE P. DAVENPORT*
Defenders of Wildlife
1130 17th St. NW
Washington, DC 20036
jdavenport@defenders.org

KRISTEN MONSELL*
Center for Biological Diversity
2100 Franklin St. Ste. 375
Oakland, CA 94612
kmonsell@biologicaldiversity.org

ERICA A. FULLER*
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
efuller@clf.org

*Counsel for Amici Conservation Groups
Whale and Dolphin Conservation,
Defenders of Wildlife, Conservation
Law Foundation, and Center for
Biological Diversity*

   /s/ Michael Poon
   MICHAEL POON*
   Pacific Legal Foundation

22